## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MONIFA GRANT
*on behalf of herself and all*
*others similarly situated,*

     Plaintiff,

v.                                                                          Case No.: 8:19-cv-00363-JSS

REGAL AUTOMOTIVE GROUP, INC.
D/B/A REGAL HONDA,

     Defendant.

_____/

### Defendant's Renewed Motion for Summary Judgment

### Introduction

Under the TCPA, a seller is vicariously liable for a telemarketer's voicemail messages only if a common agency relationship existed between the seller and the telemarketer. The court must therefore address the following questions:

- **Actual agency** exists if the seller exercises control over the telemarketer. Regal hired BDC Promotions, who then purchased the list of numbers to be called, scripted and recorded the voicemail message to be left, and located and hired Voice Logic to initiate the calls. Did Regal exercise control over Voice Logic?

- **Apparent agency** exists if the seller affirmatively communicates to call recipients that the telemarketer Logic was authorized to act on its behalf and the recipients relied on the representation. Here Regal did not communicate with persons receiving calls initiated by Voice Logic. Did Regal create an apparent agency relationship with Voice Logic?

- **Ratification** exists if only if an agency relationship exists *and* the seller knows or should know that the telemarketer is violating the TCPA yet fails to take steps to stop it. There was no agency relationship between Regal and Voice Logic; Regal could not have known the calls violated the TCPA, and demanded the calls stop when it received complaints from recipients. Did Regal ratify the actions of Voice Logic?

**The Telephone Consumer Protection Act of 1991**

Finding that "[t]he use of the telephone to market goods and services to the home and other businesses" had become "pervasive," Congress enacted the Telephone Consumer Protection Act ("TCPA") in 1991.[1] As relevant here, the TCPA makes it unlawful for any person within the United States to "to make any call…using…an artificial or prerecorded voice…to any telephone number assigned to…cellular telephone service."[2]

**Statement of facts**

In Fall 2017, Justin Specht, the owner of BDC Promotions, Inc. (BDC) pitched the idea of conducting a ringless voicemail (RVM) campaign for Regal to Ken Hallworth, a general sales manager at Regal whom Specht believed was a "novice" in the ad campaign arena.[3] Regal agreed to the campaign and as a result, the following RVM was left on the voicemail platform Grant uses on her cellphone on October 4, 2017:

> Hi my name is Ken Hallworth, General Manager with Regal Honda. I'm sorry I missed you and didn't get a chance to speak to you personally. I'm calling with some great news. Your approved for a loan up to $40,000 and an interest rate as low as 1.9%. Because of your preferred credit status, were going to give you a free smartwatch or a free three-day two-night cruise for two with five-star dining included aboard a Carnival or Royal Caribbean cruise line absolutely free. Just for coming in this Friday or Saturday October 6th and 7th. Please feel free to call me back, my names Ken and make an appointment to see me. You can reach me at area code 863-588-4020. That number again is 863-588-4020. Thanks so much, I look forward to speaking to you, my names Ken and I look forward to seeing you on the showroom floor. Have a great day.[4]

---

[1] Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227.

[2] 47 U.S.C. § 227(b)(1)(A)(iii).

[3] *See,* Deposition of Justin Specht, Exhibit 1, at pp. 17, 56.

[4] *See*, Complaint DE-1 at ¶ 29.

The voice on the message did not belong to Hallworth but rather Specht, who wrote the script and recorded it.[5] Hallworth "never approved the script, never [saw] the script, never heard the script, nor would [he] approve a script like that."[6] Hallworth also wouldn't have let Specht pretend he was him and would never use a message that included an interest rate because "that's just going to create complete mayhem."[7] Hallworth never gave Specht permission to use Regal Honda's name in the message.[8]

Specht and Hallworth had met only a few weeks or so before the ad campaign was conducted.[9] The meeting was spurred by a successful ad campaign Specht had conducted for Regal's Kia dealership headed by another general sales manager.[10] The Kia campaign did not involve ringless voicemails; that campaign consisted only of a postcard "mailer" in conjunction with "live calls" from a call center.[11] Regal, in fact, had never been involved in a ringless voicemail campaign prior to the one that created this lawsuit.[12]

Hallworth was the only Regal employee Specht communicated with during the lead-up to the RVM campaign.[13] Specht never told Hallworth that RVMs might violate the TCPA.[14] Voice

---

[5] *See,* Specht Deposition at p. 58.

[6] *See*, July 10, 2019 Deposition of Carl (Ken) Hallworth, Exhibit 2 at p. 39.

[7] *Ibid.* at p. 31.

[8] *See,* Specht Deposition at p. 42.

[9] *Ibid.* at p. 15.

[10] *Ibid.*

[11] *Ibid.* at p. 14.

[12] *See*, June 14, 2019 Deposition of Sal Campisi, Exhibit 3 at p. 13.

[13] *See,* Specht Deposition at p. 17.

[14] *Ibid.* at p. 36.

Logic never explained to Specht how RVM technology works.[15] And Specht, himself, hadn't heard of the TCPA at the time he was pitching the idea to Hallworth.[16] Hallworth had no idea the TCPA existed.[17] Regal's owner (Sal Campisi), like Hallworth, didn't know the TCPA existed until after his company was sued.[18]

After signing the contract with BDC, Regal's involvement in the RVM campaign was limited to paying BDC's bill and agreeing to Specht's suggestion Regal offer smartwatches and cruises to people that came into the dealership on October 6th or 7th because of the campaign.[19] The cruises and smartwatches were purchased by BDC.[20]

BDC requested that Regal provide a "customer list" for the campaign but Hallworth refused.[21] Realizing it would need phone numbers from the vendor, BDC then determined the scope of search to conduct for cell phone numbers and paid $300 for a list of names and telephone numbers to List Service, a company in New York.[22] BDC—without Regal's input-- then hired Voice Logic to place the RVMs.[23] BDC provided Voice Logic the names and numbers BDC received from List Service along with the prerecorded message Specht had written and

---

[15] *Ibid.* at p. 28.

[16] *Ibid.* at pp. 3, 35.

[17] *See*, Hallworth Deposition at p. 20.

[18] *See*, Campisi Deposition at p. 11.

[19] *See,* Specht Deposition at p. 57.

[20] *Ibid.* at pp. 40-41.

[21] *Ibid.* at p. 57 (Q. "Regal didn't provide you any customer information?" A. "No, they would not.")

[22] *Ibid.* at pp. 23-24, 26, 57.

[23] *Ibid.* at p. 58.

recorded.[24] Regal had no contact with Voice Logic.[25] At the direction of BDC, Voice Logic then initiated the RVMs.[26]

It didn't take long for the RVM campaign to go south. Because Hallworth's name was included in the message, he began to receive angry calls from persons receiving the RVMs.[27] He responded by calling Specht, having a "heated" conversation about the complaints, and telling Specht to stop the campaign.[28] Specht told Hallworth he would do so immediately.[29]

The RVM campaign failed to increase sales and was something Hallworth would "never" do again, even in the absence of this lawsuit.[30] Specht was never again hired by Regal.[31] He believes it was because Regal was not "happy with the outcome."[32]

### The FCC's *Dish Network* Ruling

Congress authorized the FCC to make rulings regarding the TCPA.[33] And "[d]istrict courts may not determine the validity of FCC orders, including by refusing to enforce an FCC interpretation, because deeming agency action invalid or ineffective is precisely the sort of review the Hobbs Act delegates to the courts of appeals in cases challenging final FCC orders."[34]

---

[24] *Ibid.* at p. 43.

[25] *Ibid.* at p. 58.

[26] *Ibid.* at p. 11.

[27] *See,* Hallworth Deposition at p. 31.

[28] *Ibid*. at p. 34-35.

[29] *Ibid.*

[30] *See*, November 7, 2019 Hallworth Deposition, Ex. 4. at p. 55.

[31] *See*, Specht Deposition at p. 53.

[32] *Ibid.*

[33] *See, Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1305 (11th Cir. 2015).

[34] *Id.*

Consistent with its oversight role, the FCC agreed, in 2013, to review petitions requesting clarity on a seller's liability for unlawful telemarketing calls made by a third-party.[35] One of the petitions came out of the Sixth Circuit Court in a case called *Charvat vs. EchoStar*. There the Court was considering an appeal of a district court's decision granting a seller summary judgment based on its finding the seller "did not have the right to control the manner and means of the retailers' conduct as required under state agency law."[36] Instead of reviewing the case, the Sixth Circuit referred the matter to the Commission for review.[37]

The second case that generated a petition to the FCC had been filed by the Federal Trade Commission and various states against Dish Network claiming the company—through its authorized dealers—had made "unlawful prerecorded calls." The complaint contained the following allegations:

> (1) DISH had authorized its dealers "to use DISH Network trademarks and trade names, to collect money for DISH Network, and to perform other services as part of their positions as authorized dealers;" (2) DISH "paid commissions and other financial incentives to the Dealers for telemarketing services;" (3) DISH "received complaints from consumers regarding the Dealers' telemarketing practices, and thereby, knew or consciously avoided knowing that the Dealers were violating" telemarketing restrictions; and (4) despite possessing contractual authority to terminate the dealers, DISH "continued to retain the Dealers to perform telemarketing services ... after receiving consumer complaints."[38]

---

[35] *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (Tcpa) Rules*, 28 F.C.C. Rcd. 6574, 6578 (2013) ("*Dish Network*").

[36] *Id.* at 6576.

[37] *Id.* at 6577.

[38] *Id.*

The district court denied Dish Network's motion to dismiss finding the plaintiffs were required only to show the calls were made for the "benefit of" Dish Network and not that a "formal agency relationship [existed] between DISH and its telemarketers."[39] The court then stayed the case and, in light of the pending petition filed in the Sixth Circuit case, ordered the parties to seek a ruling from the FCC.[40]

Three (3) separate petitions from the two (2) lawsuits ultimately made their way to the Commission's desk where the competing positions of the petitioners were described as follows by the Commission:

> Charvat's petition asks the Commission to declare that a seller is liable under the TCPA for unlawful telemarketing calls that are sent by third parties "on behalf of" or "for the benefit of" the seller. In its portion of the Joint Petition and in its separate petition, DISH asks the Commission to declare that the TCPA does not impose liability on a seller for unlawful telemarketing calls made by third-party retailers, at least in the absence of proof that the third-party telemarketer acted at the seller's direction and request. The States and the United States ask the Commission to find that, "under the TCPA, a call placed by a seller's dealer to market the seller's services qualifies as a call 'on behalf of' and initiated by the seller."[41]

The FCC sided with Dish Network, stating:

> Our rules have long drawn a distinction between the telemarketer who initiates a call and the seller on whose behalf a call is made. In accordance with those rules…we clarify that a seller is not directly liable for a violation of the TCPA unless it initiates a call, but may be held vicariously liable under federal common law agency principles for a TCPA violation by a third-party telemarketer.[42]

---

[39] *Id.*

[40] *Id.* at 6578.

[41] *Id.*

[42] *Id.* at 6582.

Because of this "distinction," the FCC ruled "an action taken for the benefit of a seller by a third-party retailer, without more, is [in]sufficient to trigger the liability of a seller."[43] And in an apparent effort to provide additional guidance going forward, the FCC held "agency principles" would apply to a determination of seller liability and include not only "classical agency," which contemplates "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control," but also apparent agency and ratification.[44]

According to the Commission, factors that could support an apparent authority claim included:

- the seller allowing the call initiator "access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information";
- the call initiator being able to "enter consumer information into the seller's sales or customer systems";
- the seller authorizing the call-initiator "to use the sellers trade name, trademark and service mark may also be relevant;" and
- the seller "approv[ing], wr[iting] or review[ing]the [] telemarketing scripts."[45]

As for ratification, the FCC held:

a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.[46]

---

[43] *Id.* at 6593.

[44] *Id.* at 6586.

[45] *Id.* at 6592.

[46] *Id.*

The Commission's ruling that a seller could be "vicariously liable under federal common law agency-related principles for violations of [the TCPA] committed by telemarketers that initiate calls to market its products or services" has since been implicated in scores of TCPA lawsuits. And, as demonstrated below, courts reviewing TCPA cases have aligned themselves with the FCC's *Dish Network* ruling.

**Arguments**

1. **Regal has no "direct" liability for the RVMs, as it did not initiate the calls.**

The FCC ruled in *Dish Network*: "a seller is not directly liable for a violation of the TCPA unless it initiates a call."[47] The Eleventh Circuit's holding in *Murphy* compels this Court to abide by the FCC's ruling.[48] Regal has no direct liability for Voice Logic initiating the RVMs.

2. **Regal did not exercise control over Voice Logic and therefore, no agency relationship existed.**

It is undisputed in this case that Regal was not involved in the selection of Voice Logic and never communicated with Voice Logic, much less that it had the ability to control Voice Logic's actions in sending the RVMs. The evidence demonstrates that BDC alone chose Voice Logic, contracted with Voice Logic, and provided a list of telephone numbers it purchased along with the message Specht had recorded to Voice Logic.

In *Commodity Futures v. Gibraltar*, the Eleventh Circuit Court held agency, "either implied or express, requires: (1) consent to the agency by both the principal and agent; and (2) the control of the agent by the principal."[49] Later in *Wolf v. Celebrity Cruises*, the court set out "several probative factors" important to determining if an agency relationship exists, including:

---

[47] *Id.,* 28 F.C.C. Rcd. at 6582.

[48] *Murphy*, 797 F.3d 1302, 1307.

[49] *Id.* 575 F.3d 1180, 1189 (11th Cir. 2009).

> (1) direct evidence of the principal's right to or actual exercise of control; (2) the method of payment for an agent's services, whether by time or by the job; (3) whether or not the equipment necessary to perform the work is furnished by the principal; and (4) whether the principal had the right to fire the agent.[50]

Regal had no control over Voice Logic and none of the factors weigh in favor of an agency relationship between Regal and Voice Logic. More to the point, there is no evidence of any relationship between Regal and Voice Logic, at all. Regal merely signed a contract with BDC and then, stepped aside while BDC controlled the selection of vendors needed to conduct the ad campaign.

According to Specht, Regal did not give him permission to use its name and would not provide a customer list. So Specht purchased a list of telephone numbers from List Service and provided that list directly to Voice Logic. Specht then drafted the script, recorded the message to be used in his voice pretending to be Hallworth, and provided the recorded message to Voice Logic, who then sent the RVMs to numbers provided by Specht. Regal exercised no control over Voice Logic, much less the degree of control necessary to prove an agency relationship existed.

Grant may argue BDC was Regal's agent. But there no facts demonstrating Regal exercised control over BDC and even if there were, it was not BDC that initiated the calls. *Dish Network* specifically holds there must be an agency relationship between the seller and the actual telemarketer.[51] A recent Ninth Circuit Court decision in similar TCPA case is instructive on the agency issue.

In *Thomas v. Taco Bell*, the plaintiff filed a TCPA claim against several parties including Taco Bell Corporation ("Taco Bell") for a text message she received advertising a Taco Bell

---

[50] *Id.*, 683 Fed. Appx. 786, 797 (11th Cir. 2017) (unpublished).

[51] *Dish* Network, 28 F.C.C. Rcd. 6574, 6592 (seller "may be held vicariously liable under federal common law agency principles for a TCPA violation by a third-party telemarketer.")

product.[52] Similar to Regal in the instant case, Taco Bell had no direct relationship with the telemarketer. Instead it was part of group that hired a marketing company that then hired the telemarketer to send the text message at issue.[53] The district court held "to succeed on this vicarious liability theory, Ms. Thomas must demonstrate that … Taco Bell controlled or had the right to control…the manner and means of the text message campaign…conducted."[54] The Ninth Circuit Court agreed with the district court's analysis of the agency issue that "all of the control over the manner and means of the text message campaign was exercised by [the association, the marketing company, and the initiator], and Ms. Thomas has not presented any evidence ... demonstrating that Taco Bell controlled the actions of these entities with respect to the campaign."[55]

In this case, Regal didn't "control[] the actions of" either BDC or Voice Logic with respect to the prerecorded message sent to Plaintiff. Regal's involvement with BDC was limited to agreeing to the campaign and paying the bill. BDC bought numbers from a vendor of its choosing (because Regal would not provide customer information), wrote and recorded the script pretending to be Hallworth, chose Voice Logic, and sent the numbers it purchased and its recorded message to Voice Logic. "[A]ll of the control over the manner and means of the [voicemail] message campaign was exercised by [BDC and Voice Logic], and [there is no] evidence ... demonstrating that [Regal] controlled the actions of these entities with respect to the

---

[52] *Id.*, 582 Fed. Appx. 678 (9th Cir. 2014) (unpublished).

[53] *Id.*, at 678-679.

[54] *Id.*, at 679.

[55] *Id.* (internal quotations and brackets omitted).

campaign."[56] BDC controlled the numbers to be called, the message to be sent, and the entity to send that message. Voice Logic controlled the means by which the messages would be sent.

District courts in Florida have applied a similar "control" analysis to determine no agency relationship existed for TCPA purposes. In *Strauss v. CBE Group,* for example, the court found Verizon exercised insufficient control to find an agency relationship with its debt collection agency despite evidence showing Verizon had access to the debt collector's systems and information, provided demographic and account information to the debt collection, and was involved in creating transcripts to be read to debtors.[57] Regal's involvement in controlling the RVM campaign was considerably less than the control Verizon had over it debt collector's conduct. Voice Logic was not Regal's agent.

There could be no an agency relationship between Regal and Voice Logic because the entities were virtually strangers. At best, Grant is likely left to argue Regal profited from the voicemail campaign and therefore, should be liable. No evidence supports this argument factually, and it runs counter to *Dish Network*, in which the FCC specifically rejected this two-dimensional argument, stating: "an action taken for the benefit of a seller by a third-party retailer, without more, is [in]sufficient to trigger the liability of a seller under section either [sic] section 227(c) or section 227(b)."[58]

Because Regal exercised no control over Voice Logic or the RVM campaign, there was no agency relationship between Regal and Voice Logic.[59]

---

[56] *See, Thomas*, supra at p. 679.

[57] *Id.*, 173 F. Supp. 3d 1310.

[58] *Id.*, 28 F.C.C. Rcd. at 6586.

[59] For the same reasons, there was agency relationship between Regal and BDC, either.

**3. No apparent agency existed between Regal and Voice Logic because Regal never told anyone Voice Logic was acting on its behalf and provided no assistance to Voice Logic.**

To show apparent agency Plaintiff must establish "first, a representation by the principal *to the plaintiff*, which, second, causes the plaintiff reasonably to believe that the alleged agent is authorized to act for the principal's benefit, and which, third, induces the plaintiff's detrimental, justifiable reliance upon the appearance of agency."[60] As the old Fifth Circuit noted in *Smith-Perry Elec. Co. v. Transp. Clearings of Los Angeles*:[61]

> The principal is liable only where there has been an appearance of authority created by himself. One who seeks to charge another as a principal by reason of a transaction with one acting as an agent must show facts from which the apparent authority might be inferred and that such facts were known to and relied upon by him in entering upon the transaction.[62]

In this case, Regal made no representation to anyone, much less a representation to Grant that Voice Logic was authorized to send the messages to persons who had not consented to receiving them.[63] Even if that had occurred, there could be no evidence of "detrimental reliance" by Grant or any person receiving the messages. Hence, there is no basis for a finding of apparent authority.

---

[60] *Ceithaml v. Celebrity Cruises, Inc.*, 257 F. Supp. 3d 1326, 1335 (S.D. Fla. 2017), *aff'd*, 739 F. App'x 546 (11th Cir. 2018), *citing*, *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1236 (11th Cir. 2014) (emphasis added).

[61] The Eleventh Circuit Court of Appeals adopted as binding precedent all prior decisions of the former Fifth Circuit Court of Appeals issued prior to October 1, 1981. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

[62] *Id.*, 243 F.2d 819, 821 (5th Cir. 1957). This ruling is consistent with the FCC's ruling in *Dish Network* that "Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." *Id.*, 28 F.C.C. Rcd. at 6586.

[63] To the extent Plaintiff would argue the voicemail message identified the caller as Ken Hallworth from Regal, the evidence demonstrates Specht pretended he was Hallworth without Hallworth's permission, and Regal never authorized BDC to use its name.

In *Keating v. Peterson's Nelnet*, the Sixth Circuit found no apparent agency in a TCPA case, stating: "nothing in the record before this court reasonably can be construed to indicate that the defendants held out to third parties, or to anyone else, that [the telemarketer] was authorized to send text messages to individuals who had not agreed to receive them."[64]

In *Thomas* the Ninth Circuit held:

> Apparent authority is inapplicable because it can only be established by proof of something said or done *by the alleged principal, on which the plaintiff reasonably relied*. Thomas has not shown that she reasonably relied, much less to her detriment, on any apparent authority with which Taco Bell [] allegedly cloaked [the association, the marketing company, and the initiator].[65]

Regal made no representations to Grant or any putative class member that it authorized Voice Logic to leave the messages at issue. And neither Grant nor any putative class member could establish he/she "reasonably relied, much less to her[/his] detriment" on any such representation.[66] In the absence of an affirmative representation by Regal and detrimental reliance by the recipient, no basis exists for an apparent agency relationship.

*Dish Network* also supports Regal's position no apparent agency relationship existed. In its Ruling, the FCC list factors that could support an apparent authority claim, including:

- the seller allowing the call initiator "access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information";
- the call initiator being able to "enter consumer information into the seller's sales or customer systems";
- the seller authorizing the call-initiator "to use the sellers trade name, trademark and service mark may also be relevant;" and

---

[64] *Id.*, 615 Fed. Appx. 365, 374 (6th Cir. 2015) (unpublished), *see also Warciak v. Subway Restaurants, Inc.*, 2020 WL 559105, at *2 (7th Cir. Feb. 5, 2020) ("Warciak's complaint lacks sufficient facts showing Subway manifested to the public that T-Mobile was its agent.")

[65] *Id.*, 582 Fed. Appx. 679–80 (emphasis added).

[66] *Id.*

- the seller "approv[ing], wr[iting] or review[ing]the [] telemarketing scripts."[67]

Here the only evidence is Regal provided Voice Logic no "access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information"; Voice Logic was unable to "enter consumer information into [Regal's] sales or customer systems"; Regal did not authorize Voice Logic "to use the [Regal's] trade name, trademark and service mark may also be relevant;" and Regal never "approv[ed], wr[ote] or review[ed] the [] telemarketing scripts."[68]

Case law applying common law apparent agency principles and the FCC's *Dish Network* ruling both demonstrate Regal did not create an apparent agency relationship with Voice Logic.

### 4. Ratification requires both an agency relationship *and* acceptance of the benefits of the wrongful conduct knowing all material facts.

#### A) Ratification can't exist in the absence of an agency relationship.

Ratification applies to "acts." And the Eleventh Circuit has consistently held an agency relationship to be a prerequisite to ratification of an unauthorized act. In *McDonald v. Hamilton Electric*, for example, the Court stated: "A principal can ratify the unauthorized act of an agent purportedly done on behalf of the principal either expressly or by implication through conduct that is inconsistent with an intention to repudiate the unauthorized act."[69] The facts in *McDonald* demonstrate the main reason ratification can't exist in this case.

---

[67] *Dish Network,* 28 F.C.C. Rcd. 6574, 6592.

[68] *Id.*

[69] *Id.*, 666 F.2d 509, 514 (11th Cir.), *cert. denied*, 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 144 (1982).

The defendant in *McDonald* provided letters of assent to two (2) entities giving them limited rights to negotiate certain collective bargaining agreements.[70] The letters empowered the agents to engage in limited contract negotiations on behalf of the defendant.[71] The agents thereafter entered into an agreement that required the defendant to give money to a specific fund. When the defendant objected, the fund sued claiming ratification.[72] The Court rejected the argument on the basis the actions of the agents exceeded their agency and therefore could not "serve as a basis for finding…ratification."[73] Stated another way, ratification cannot exist unless the unauthorized act was committed by an agent.

The Eleventh Circuit Court more recently reiterated that an agency relationship must exist for ratification of an unauthorized act to be possible, stating: "While only interactions that are within the scope of an agency relationship affect the principal's legal position, the principal may also ratify his agent's unauthorized actions, thus becoming bound by their legal consequences."[74]

The facts of this case applied to these binding cases demonstrate there was no "agency" relationship between Regal and Voice Logic (or BDC) with respect to the voicemails at issue.[75] The absence of an agency relationship dooms any potential ratification because "although a principal is liable when it ratifies an originally unauthorized tort, the principal-agent relationship

---

[70] *Id.*, 666 F.2d 509, 511.

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1308 (11th Cir. 2017) (internal citations and brackets omitted).

[75] *See*, sections 2 and 3, above.

is still a requisite, and ratification can have no meaning without it."[76] Here there was not agency relationship between Regal and Voice Logic.

In a recent TCPA decision, the Ninth Circuit Court rejected a ratification claim finding no agency relationship. *Kristensen v. Credit Payment Services* arose out of a marketing campaign involving three payday lenders who entered into separate agreements with a company (Click Media) that buys and sells customer leads.[77] Click Media, contracted with a company that gathers names from thousands of "publishers" who generate leads for loan providers.[78] Click Media then gave the names to AC Referral, who sent out text messages.[79]

The result, as one might expect, was not successful loan leads for the lenders, but a TCPA class action suit claiming they and Click Media were liable for AC Referral's unlawful text messages. The district court rejected the plaintiff's argument the payday lenders "ratified AC Referral's texting campaign by accepting leads while knowing that AC Referral was using texts to generate those leads."[80] The Ninth Circuit affirmed the district court's ruling finding the absence of an agency relationship between the payday lenders and AC Referral doomed the plaintiff's vicarious liability argument.[81]

---

[76] *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003); *see also In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 223 F. Supp. 3d 514, 527 (N.D.W. Va. 2016), aff'd sub nom., *Hodgin v. UTC Fire & Sec. Americas Corp., Inc*., 885 F.3d 243 (4th Cir. 2018) ("Without this 'prerequisite' principal-agent relationship, a defendant cannot "ratify" the actions of third parties.")

[77] *Id.*, 879 F.3d 1010, 1012-14 (9th Cir. 2018).

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.*, at 1015.

In reaching its conclusion, the Court found it significant that none of the payday lenders had a contract with AC Referral and did not communicate with AC Referral.[82] These facts left the court to conclude "AC Referral was neither an agent nor a purported agent of the lenders [so] AC Referral's actions do not qualify as ratifiable acts."[83]

The facts in the case at bar are analogous to those in *Christenson*. Here Regal had no contract with Voice Logic and never communicated with Voice Logic. The only party Regal communicated with was BDC, who then contracted with Voice Logic to send the RVMs. Voice Logic, like AC Referral, "was neither an agent nor a purported agent of [Regal, so Voice Logic's] actions do not qualify as ratifiable acts."[84]

Because no agency relationship existed between Regal and Voice Logic, ratification of Voice Logic's purportedly illicit RMV campaign is legally and factually impossible. Even if an agency relationship existed, however, ratification could not exist under the facts of this case.

**B) Regal did not know, nor could it have known, Voice Logic's RVMs violated the TCPA, and Regal immediately took action to stop the campaign after receiving complaints.**

*Dish Network* is binding on this Court. And in that Ruling, the FCC stated a seller ratifies its agent's unlawful actions only if "the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct."[85] The undisputed evidence refutes any argument Regal knew or should have known Voice Logic was violating the TCPA or that it failed to take action to stop the RVMs when people complained.

---

[82] *Id.*

[83] *Id.* at 1014-15.

[84] *Id*.

[85] *Id.*

Specht could not have told Regal about the TCPA—much less that Voice Logic's RVMs would violate the statute—as he admitted during deposition, he didn't even know the TCPA existed when he was pitching RVMs to Hallworth and he didn't know how Voice Logic's RVMs worked.[86] Hallworth and Campisi never heard of the TCPA until after the RVM campaign.

It would have, in fact, have been impossible for Regal to *know* Voice Logic's RVMs would violate the TCPA in October 2017, as Regal is unaware of any court *ever* ruling Voice Logic's RVMs violate the TCPA. The first published decision from any court on the TCPA implications of so-called "ringless voicemail" or "direct-to-voicemail messages" was issued by the United States District Court for the Western District of Michigan approximately *10 months after* the ad campaign at issue in this case was over.[87] And that decision found only that the RVMs left by a company called VoApps were "calls" as defined by the TCPA, not that RVMs violate the TCPA.[88] *Saunders* did not involve Voice Logic's telephone equipment, so it is cannot be proven Regal "knew (or reasonably should have known) that [Voice Logic] was violating the TCPA" by sending RVMs.[89]

Returning to *Kristensen*, while the Ninth Circuit Court determined there was no agency relationship between the initiator and the payday lenders, it did find an agency relationship existed between Click Media and AC Referral.[90] The court nonetheless affirmed summary

---

[86] Regal suspects, based on other TCPA cases involving RVM service providers, Voice Logic likely markets its services to U.S. companies as TCPA compliant.

[87] *See, Saunders v. Dyck O'Neal, Inc*., 319 F. Supp. 3d 907, 909 (W.D. Mich. 2018) ("This is a case of first impression.")

[88] *Id.*

[89] *See*, *Dish Network*, 28 F.C.C. Rcd. 6574, 6592.

[90] *Id.*, 879 F.3d at 1015.

judgment for Click Media's finding it "lacked the requisite knowledge of the agent's wrongdoing."[91]

In reaching its decision, the Court rejected the plaintiff's argument that mere knowledge of the *type* of communication AC Referral was using created a basis for determining Click Media "should have known" the campaign would violate the TCPA, stating:

> Kristensen points to the fact that Click Media's contract with AC Referral stated that AC Referral could use text message marketing and required AC Referral to comply with the TCPA. According to Kristensen, this was sufficient to trigger Click Media's duty to investigate whether AC Referral was acting in compliance with law. We disagree. The knowledge that an agent is engaged in an otherwise commonplace marketing activity is not the sort of red flag that would lead a reasonable person to investigate whether the agent was engaging in unlawful activities. Because Click Media had no knowledge of facts that would have led a reasonable person to investigate further, Click Media cannot be deemed to have ratified AC Referral's actions and therefore is not vicariously liable.[92]

Applying the same logic to this case, there is no "evidence that [Regal] had actual knowledge that [Voice Logic] was [initiating calls] in violation of TCPA. Nor is there any basis to infer that [Regal] assumed the risk of lack of knowledge, [as there is no] evidence that [Regal] 'had knowledge of facts that would have led a reasonable person to investigate further,' but ratified [Voice Logic's] acts anyway without investigation."[93]

The fact Regal entered into a contract agreeing to utilize RVMs "is not the sort of red flag that would lead a reasonable person to investigate whether the agent was engaging in unlawful

---

[91] *Id.* (plaintiff presented "no evidence that Click Media had actual knowledge that AC Referral was sending text messages in violation of TCPA.").

[92] *Id.* (internal citations omitted).

[93] *See, Kristensen*, 879 F.3d at 1015, *see also, Johansen v. HomeAdvisor, Inc.,* 218 F. Supp. 3d 577, 587 (S.D. Ohio 2016) ("Johansen's jurisdiction-through-ratification theory fails for a second reason: he has not shown that HomeAdvisor knew or should have known that Lead House was violating the TCPA when HomeAdvisor purchased Johansen's sales lead from One Planet.")

activities" as prerecorded telemarketing campaigns are neither *per se* illegal nor uncommon.[94] Grant will provide the Court no case law—from prior to the 2017 RVM campaign—holding RVMs in general, much less Voice Logic's RVMs, violate the TCPA. Regal, therefore, did not ratify the calls made by Voice Logic.

Even if Regal knew or should have known Voice Logic was violating the TCPA, the evidence demonstrates Regal attempted to stop the ad campaign once complaints were made. The evidence on this issue, too, is undisputed.

Regal began receiving complaint calls after the ad campaign began. Hallworth called Specht, had a "heated" conversation, and told Specht to stop the campaign. Specht said he would do so immediately. Hallworth's demand the calls stop precludes this Court from finding Regal ratified the RVM campaign because, under *Dish Network*, a seller ratifies the wrongful conduct of an agent only if the it "fail[s] to take effective steps within its power to force the telemarketer to cease that conduct."[95]

The RVM campaign also resulted in no benefit to Regal—a necessary element of ratification—as  it failed to increase sales. Hallworth testified the campaign was so bad it was something he would "never" do again, even if this lawsuit hadn't been filed. Specht believes Regal was so unhappy with the campaign it never hired him again.

Because Regal did not receive a benefit from the RVMs, immediately contacted BDC to demand the campaign cease when it received complaints, and neither knew nor should have

---

[94] *See, Kristensen*, 879 F.3d at 1015.

[95] *See, Dish Network*, 28 F.C.C. Rcd. at 6592; *see also, Hodgin v. UTC Fire & Sec. Americas Corp., Inc.*, 885 F.3d 243, 253 (4th Cir. 2018) (finding no ratification where "Honeywell ultimately terminated its sales agreement with ISI because, among other things, Honeywell continued to receive complaints about ISI's telemarketing practices.").

known the RVMs violated the TCPA, Regal did not ratify Voice Logic's purportedly unlawful RVM campaign.

**Conclusion**

Regal paid BDC to run an ad campaign that included RVMs. BDC purchased the numbers to be called, wrote and recorded the message to be played, and hired Voice Logic to send the RVMs—all without Regal's involvement. Regal did not control Voice Logic or the RVM campaign, made no representation to the public Voice Logic was acting on its behalf, provided Voice Logic no access to it databases, had no reason to believe the RVMs would violate the TCPA, and repudiated Voice Logic's conduct when people complained. This evidence is undisputed and compels the Court to grant summary judgment in favor of Regal.

Respectfully submitted by:

 /s/ Dale T. Golden
DALE T. GOLDEN, ESQ.
Florida Bar No.: 0094080
**GOLDEN SCAZ GAGAIN, PLLC**
201 North Armenia Avenue
Tampa, Florida 33609-2303
Phone: (813) 251-5500
Fax: (813) 251-3675
dgolden@gsgfirm.com
Counsel for Regal Automotive Group, Inc.