**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

**Case No.: 8:19-cv-00363-SDM-JSS**

**MONIFA GRANT**, individually and on
behalf of others similarly situated,

       Plaintiff,                           **CLASS ACTION**

v.                                      **JURY TRIAL DEMANDED**

**REGAL AUTOMOTIVE GROUP, INC.,**

       Defendant.

_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT[1]

Plaintiff Monifa Grant, pursuant to Federal Rule of Civil Procedure 56, moves for summary judgment with respect to her and the class members' claims against Defendant Regal Automotive Group, Inc., under the Telephone Consumer Protection Act, 47 U.S.C. §227 *et seq.* ("TCPA"), and states:

### I.   INTRODUCTION

This case concerns Defendant's violation of the Telephone Consumer Protection Act ("TCPA") by bombarding individuals with unwanted, prerecorded marketing calls. Specifically, on October 4th and 5th 2017, Defendant, through its marketing vendor, BDC Promotions, Inc., ("BDC"), attempted to send 14,032 unsolicited "ringless" voicemails ("RVMs") to consumers'

---

[1] To avoid running afoul of the one-way intervention rule, Plaintiff respectfully requests the Court enter an order granting class certification before ruling on Plaintiff's Motion for Summary Judgment. *See London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1252 (11th Cir. 2003) (*quoting Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974)) ("'One-way intervention' occurs when the potential members of a class action are allowed to 'await . . . final judgment on the merits in order to determine whether participation [in the class] would be favorable to their interests.'").

cellular telephone numbers in violation of the TCPA.

The "ringless" voicemail platform used to transmit the RVMs was provided by a Canadian company, Voicelogic, who not only flaunts the ability of its technology to invade the privacy of consumers, but also consumers' inability to stop the invasion of privacy caused thereby.[2] Indeed, the technology at issue – RVM – works by delivering targeted, prerecorded telemarketing voice messages *en masse* to the voicemail boxes of cellular subscribers. The technology is a perverted use of the standard voicemail system. Instead of leaving a typical voicemail message when a cellular subscriber is unavailable to receive a call, RVMs deliver a prerecorded voicemail message directly to the cellular subscriber's voicemail box without ever giving the consumer the opportunity to answer – or to block – the incoming call. Thus, consumers have absolutely no control over who can leave an RVM, how long the messages are, or how often the messages are left on their voicemail.

RVMs are legally and technologically no different than voice calls or text messages. As one court from this Circuit recently recognized, a "'ringless' voicemail accompanied by a pre-recorded message is no less intrusive than a standard voicemail or text message-both of which have been held to constitute 'calls' under the TCPA." *Schaevitz v. Braman Hyundai, Inc.*, No. 1:17-cv-23890-KMM, 2019 U.S. Dist. LEXIS 48906, at *15 (S.D. Fla. Mar. 25, 2019) (citing *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1305 (11th Cir. 2015) ("The prohibition against auto dialed calls applies to text message calls as well as voice calls.")). The Court therefore

---

[2]  *See* Voicelogic, Ringless Voicemail Service – Voicecasting, *available at* https://voicelogic.com/ringless-voicemail/ (last visited February 6, 20200 (stating, "[Ringless voicemail] is a software system that will deliver a message to someone's voicemail without ringing their phone. The message is pre-recorded by you, and broadcasted to thousands of voice mail boxes using our Ringless Voicemail service. Voicecasting can deliver these ringless voicemails, in the same fashion as a voice broadcast system, but the phone won't ring.").

reasoned that "[a] construction of the TCPA in which a 'ringless' voicemail is a 'call' is consistent with Congress' purpose in enacting the TCPA." *Schaevitz*, 2019 U.S. Dist. LEXIS 48906, at *15. That is precisely why the court held that "the 'ringless' voicemail" that the defendant caused to be sent to plaintiff and the putative class he sought to represent "is a 'call' under the TCPA." *Id.; see also Picton v. Greenway Chrysler-Jeep-Dodge, Inc.*, No. 6:19-cv-196-Orl-31DCI, 2019 U.S. Dist. LEXIS 103796, at *5 (M.D. Fla. June 21, 2019) (rejecting argument that ringless voicemails are not subject to the TCPA) (Presnell, J.).

To prevail on her TCPA claim, Plaintiff need only demonstrate that the Defendant caused the transmission of a marketing voicemail message using a pre-recorded voice without first obtaining express written consent. *Schaevitz*, 2019 U.S. Dist. LEXIS 48906, at *14 (quoting *Manfred v. Bennett Law, PLLC*, No. 12-cv-61548, 2012 U.S. Dist. LEXIS 173935, at *6 (S.D. Fla. Dec. 7, 2012) (Seitz, J.)). It is not disputed that Defendant caused over 7,000 ringless voicemails to be successfully transmitted to Plaintiff and approximately 6,000 putative class members. It is not disputed that such "ringless" voicemails are considered "calls" under the TCPA and constituted telemarketing in that they were designed to solicit the patronage of Plaintiff and the putative class members.  It is not disputed that Defendant failed to obtain any consent, much less express written consent, from any members of the putative class. Finally, it is not disputed, indeed, it cannot be disputed, that Defendant caused the transmission of the ringless voicemails at issue by directing BDC to transmit voicemails to Plaintiff and members of the putative class. Discovery is now closed, and the record is complete, and thus there is an easy decision facing this Court: summary judgment is due to be entered in Plaintiff's favor.

Plaintiff and members of the class respectfully request the entry of summary judgment against Defendant awarding them minimum statutory damages in the amount of $500 per

"ringless" voicemail sent by or on behalf of Defendant. The entry of judgment against Defendant would serve not only to compensate Plaintiff and class members for their injuries, but also deter other companies from engaging in the same conduct and causing harm to consumers.

## II.    STATEMENT OF COMMON FACTS

Defendant is an automotive retailer that sells and services new and pre-owned Honda vehicles.  Deposition Transcript of Defendant's Corporate Representative Sal Campisi, dated June 14, 2019 ("Campisi Depo."), attached as **Exhibit A**, at 21:10-22. To advertise its business, Defendant engages in various forms of consumer marketing, including live calling and direct mailing. *Id.* at 17:10-18. In a marketing campaign that took place on October 4, 2017 and October 5, 20174, Defendant directed the transmission of 14,032 unsolicited RVMs to Plaintiff and Class members.  *See* Declaration of Ignacio Hiraldo Regarding Class Data at ¶ 9, attached as **Exhibit B;** Deposition Transcript of BDC's Corporate Representative Justin Specht, dated June 13, 2019 ("Specht Depo."), attached as **Exhibit C**, at 17:14-19. It is *undisputed* that Defendant contracted with and authorized BDC to transmit the marketing RVMs. *See* Defendant's Fourth Amended Response to Request for Admissions Nos. 1 and 2, attached as **Exhibit D** ("Defendant admits it entered into a contract with BDC Promotions, Inc., pursuant to which Defendant authorized BDC to conduct a marketing campaign that included the transmission of prerecorded messages to Plaintiff and others…"); *see also* Defendant's Amended Answer, [D.E. No. 89], at ¶¶ 4; 5; 26; 27; Second Deposition Transcript of Ken Hallworth, attached as **Exhibit E** at 23:22-24:6; 25:2-5; 45:7-24 (Former General Manager, Ken Hallworth, confirming that Defendant's corporate representative, Mr. Campisi, was aware of the ringless voicemail campaign, authorized it, and signed a check paying for it).

**A.  Defendant's Marketing Vendor**

The RVMs at issue were sent through the use of a "ringless" calling platform provided by Voicelogic, a company located in Canada. Specht Depo. at 10:17-21; 11:2-4. Notably, BDC's contract with Defendant specifically authorized BDC to contract with third parties, like Voicelogic, to transmit the RVMs. BDC Event Contract and Order Form, REGAL00009, attached as **Exhibit F** (stating, "This commitment is to serve as written authorization for BDC Promotions, Inc. to perform services and/or contract with third parties to complete the sales event described above."); *see also* **Exhibit D** (stating, "REGAL000009 is a true and correct copy of the contract between BDC and Defendant."). Justin Specht, the owner of BDC, worked directly with Defendant's then General Manager, Ken Hallworth to organize and execute the campaign.  Specht Depo. at 14:24-17:13.

Defendant began using BDC as a marketing vendor in February of 2017.  *Id*. at 12:20-23. Although BDC took an active role in launching the RVM marketing campaign, Mr. Specht consulted with Defendant as to the content of the marketing and the type of giveaway or promotions that were offered in conjunction with the advertisement. *Id*. at 39:23-42:11. Accordingly, with respect to the RVMs at issue in this case, BDC was contractually authorized to launch the RVM campaign, would have followed any instructions provided by Defendant regarding the content of the calls, and would not have launched the campaign without Defendant's express permission. *Id.*

**B.  The Purchase of Plaintiff's and the Class Members' Cellular Telephone Numbers**

Plaintiff's and Class members' telephone numbers were purchased by Defendant, through BDC, from List Service Direct ("List Service"). List Service is a grey-market data broker which sells personal and private consumer data for the right price. Specht Depo at 23:24-25:14; 27:1-4; 32:17-33:17. When purchasing consumer data from List Service, BDC provides certain parameters

5

(e.g. individuals earning a salary over $40,000 or households with children under the age of 18) and List Service compiles a list of individuals that meet those parameters, and sells BDC their personal information such as cellular telephone number and home addresses. *Id.*   For the RVM campaign at issue, BDC specifically purchased only cellular phone numbers of individuals.  *Id.* at 24:10-16.

Because BDC purchased a randomly compiled list of cellular telephone numbers for consumers, Defendant, nor any of the third parties it contracted with, obtained Plaintiff's or Class member's express consent, let alone the requisite express *written* consent, to contact them on their cellular telephones with prerecorded marketing messages. Specht Depo. at 51:22-52:18; Campisi Depo. at 36:9-23. In fact, at no point in time did Defendant do anything to confirm whether BDC had secured express written consent from recipients of the RVMs before they were sent.  Campisi Depo. at 36:9-23.

### C.  Defendant's Marketing Calls to Plaintiff and Class Members

On October 4, 2017, BDC launched the first RVM campaign on behalf of Defendant and at its direction, which consisted of 12,150 RVMs. Specht Depo. at 46:4-15; Hiraldo Decl. at ¶ 7. BDC recorded the RVM that was ultimately sent to Plaintiff and members of the class after consulting with Defendant regarding the script. Specht Depo. at 39:2-41:20. Additionally, BDC provided Defendant with approximately 50 smart watches and approximately 50 free cruise pamphlets that were to be handed out to consumers that responded to the RVM.  *Id.*  Subsequently, on October 5, 2017, the transmission of an additional 1,882 RVMs was attempted. Hiraldo Decl. at ¶ 8.  Of the 14,032 total attempts, 7,740 were delivered successfully to cellular telephones. Hiraldo Decl. at ¶¶ 5-9.  The 7,740 successful deliveries were made to 5,997 unique individuals. Hiraldo Decl. at ¶ 12.

With respect to Plaintiff, BDC, on behalf of Defendant and using the Voicelogic platform,

transmitted the following RVM to Plaintiff's cellular telephone number on October 4, 2017:

> Hi my name is Ken Halworth, General Manager with Regal Honda. I'm sorry I missed you and didn't get a chance to speak to you personally. I'm calling with some great news. Your approved for a loan up to $40,000 and an interest rate as low as 1.9%. Because of your preferred credit status, were going to give you a free smartwatch or a free three-day two-night cruise for two with five-star dining included aboard a Carnival or Royal Caribbean cruise line absolutely free. Just for coming in this Friday or Saturday October 6th and 7th. Please feel free to call me back, my names Ken and make an appointment to see me. You can reach me at area code 863-588-4020. That number again is 863-588-4020. Thanks so much, I look forward to speaking to you, my names Ken and I look forward to seeing you on the showroom floor. Have a great day.

The RVM was sent to Plaintiff for purposes of marketing Defendant's business. Campisi Depo. at

23:11-24:4; Specht Depo. at 17:5-10; 21:13-17 (Q. I see. So the marketing that was being done

pursuant to this agreement, the purpose of it was drive people to the dealership on these dates

October 7 and October – 6th and 7th? A. Yes.).  The same version of the above message was sent

to individuals on October 5, 2017.  Specht Depo. at 42:12-13.

### D. Records Provided to Plaintiff Regarding the Campaigns

In response to a subpoena for documents served by Plaintiff, BDC produced detailed

spreadsheets that contain data for the RVMs that were transmitted to Plaintiff and the putative

Class (the "Campaign Reports").  Hiraldo Decl. at ¶ 3. The Campaign Reports contain identifying

information such as (1) the targets' Cellular Telephone Numbers, (2) the Date and Time an RVM

was transmitted; (3) the targets' First Name, Middle Initial, and Last names; (4) the targets'

Addresses, including zip code; and (5) a column labeled "Response" which contains a designation

as to whether each RVM was successfully transmitted.  *Id.* at ¶ 4.  In addition, BDC produced

summaries of each campaign, entitled "Voicelogic Ringless Report" (herein the "Ringless

Reports").  *Id.* at ¶ 5. The Ringless Reports summarize how many RVMs were successfully

transmitted on each campaign date.  *Id.* at ¶ 6.

Defendant, through BDC and using the Voicelogic Platform, attempted to transmit a total of 14,032 RVMs to Plaintiff and Class members during a two-day period in 2017.  Hiraldo Decl. at ¶ 9.  Of the 14,032 attempts, 7,740 were delivered successfully to cellular telephones.  Hiraldo Decl. at ¶¶ 5-9.  The 7,740 successful deliveries were made to 5,997 unique individuals.  Hiraldo Decl. at ¶ 12.  The Campaign Reports contain identifying information for every individual who received the RVM, including full name, telephone number, and mailing address.  Hiraldo Decl. at ¶ 10.  Additionally, every telephone number to which an RVM was successfully sent by BDC on behalf of Defendant was a cellular telephone number. Specht Depo. at 24:10-16; 47:16-48:2 (describing how RVMs can only be transmitted to cellular phones).

### III.   LEGAL STANDARD

Summary judgment "shall be granted, if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting Fed. R. Civ. P. 56(c)) (internal quotations omitted); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999).  A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When faced with a "properly supported motion for summary judgment," the nonmoving party "must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).  The "non-moving party must do more than present a 'scintilla' of evidence in its favor.  Rather, the non-moving party must present sufficient evidence such that 'reasonable jurors could find by a preponderance of the

evidence, for the non-movant." *Sylvia Dev. Corp. v. Calvert County Md.,* 48 F. 3d 810, 818 (4th Cir. 1995) (*quoting Anderson*, 477 U.S. at 252).

## IV.   ARGUMENT

The TCPA prohibits: (1) any person from calling a cellular telephone number; (2) using a prerecorded message; (3) without the recipient's prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii). Pursuant to the rules and regulations promulgated by the Federal Communications Commission ("FCC"), "prior express **written** consent" is required for marketing calls to cellular telephone numbers. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1838 ¶20 (Feb. 15, 2012) (emphasis supplied); 47 C.F.R. 64.1200(f)(8) (describing the requirements of prior express written consent).

Here, it is undisputed that: (i) Defendant made the calls at issue; (ii) the "ringless" voicemails utilized by Defendant are calls governed by the TCPA; (iii) Defendant called Plaintiff's and the class members' cellular telephones; (iv) Defendant's calls were for purposes of marketing; and (v) Defendant failed to obtain any consent, much less express written consent, from Plaintiff or the members of the class. Therefore, summary judgment should be granted in favor of Plaintiff and members of the class, awarding them $500 per call sent by Defendant.

### A.   **Defendant Made the Calls at Issue**.

"Defendant admits it entered into a contract with BDC Promotions, Inc., pursuant to which Defendant authorized BDC to conduct a marketing campaign that included the transmission of prerecorded messages to Plaintiff and others, in October 2017." Amend. Answer, [D.E. No. 89] at ¶¶ 4; 5; 26; 27. Despite this admission, Plaintiff anticipates that Defendant will attempt to distort vicarious liability law to argue it cannot be held liable for the calls it authorized.

"The United States Supreme Court in *Campbell-Ewald Co. v. Gomez* held that a party may

be liable under the TCPA in accordance with tort-related vicarious liability rules." *Klein v. Just Energy Grp., Inc.*, Civil Action No. 14-1050, 2016 U.S. Dist. LEXIS 84447, at *27 (W.D. Pa. June 29, 2016) (citing *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 674 (2016) (the Court had no cause to question the FCC's ruling that vicarious liability applies under the TCPA)); *see also In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois, N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C.R. 6574, 6588 (2013) (hereinafter "*Dish Network*."); *Cellco P'ship v. Plaza Resorts Inc.*, No. 12-81238-CIV, 2013 WL 5436553, at *6 (S.D. Fla. Sept. 27, 2013).  According to the FCC, "a seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *Dish Network*, 28 F.C.C.R. at 6584 at ¶ 28.

The rationale for authorizing vicarious liability under the TCPA is simple:

> the seller is in the best position to monitor and police TCPA compliance by third-party telemarketers….consistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules.  By contrast, allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. **This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case.**

*Dish Network*, 28 F.C.C.R. at 6588 at ¶ 37 (emphasis added).

Accordingly, pursuant to *Campbell-Ewald Co*. and FCC regulations, vicarious liability may be based on the principles of vicarious liability, including, but not limited to, actual authority, apparent authority, or ratification. "Reading the TCPA to incorporate baseline agency-related principles imposing vicarious liability on sellers," serves to promote the twin goals of the TCPA: (1) seeking "compensation for the harms unlawful telemarketing causes," and (2) "deter[ing]

future unlawful invasions of privacy." *Dish Network*, 28 F.C.C.R. at 6588 at ¶ 36.

### 1. Defendant is Vicariously Liable for BDCs Actions

#### a. *BDC Acted as Defendant's Agent Under Actual Authority.*

The Restatement (Third) of Agency explains that, "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01, (2006). "Once such a relationship is formed, 'traditional vicarious liability rules ordinarily make principals . . . vicariously liable for acts of their agents . . . in the scope of their authority.'" *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 660 (4th Cir. 2019) (*quoting Meyer v. Holley*, 537 U.S. 280, 285-86 (2003)). "Agency law, including a principal's liability for acts done on his behalf, protects third parties[.]" *Krakauer*, 925 F.3d at 660-61.

Here, based on Defendant's own admissions that it authorized BDC to conduct the call campaign at issue, there can be no question that BDC was acting as Defendant's agent and with actual authority. *See, e.g., Braver v. NorthStar Alarm Servs., LLC*, No. CIV-17-0383-F, 2019 U.S. Dist. LEXIS 118080, at *32 (W.D. Okla. July 16, 2019) ("[T]he court states its view that it only makes sense to hold NorthStar vicariously liable for Yodel's acts where the record conclusively shows, as it does here, that NorthStar authorized Yodel to place the calls in question.") (citing *Dish Network*, 28 F.C.C.R. at 6593 at ¶ 47)).

An essential element of agency is the principal's right to control the agent's actions. Restatement (Third) of Agency § 1.01, cmt. f(1) (2006). In particular, "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Id.* When the principal directly confers powers

upon an agent, or causes or permits the agent to reasonably believe he possess certain powers, the agent is acting with actual authority. *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1301 (D. Nev. 2014) (citing *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F.Supp.2d 1141, 1167–68 (D. Idaho 2011)); s*ee also Dobkin v. Enter. Fin. Group*, 2014 U.S. Dist. LEXIS 123317, at *10-12 (D. N.J. Sept. 3, 2014).

Agency can be created by contract or by conduct. *See, e.g., Chemtool, Inc. v. Lubrication Techs., Inc.,* 148 F.3d 742, 745–46 (7th Cir. 1998). Actual agency "does not require the principal to specify the singular acts for which his or her authority exists as long as the acts are incidental to or reasonably necessary to accomplish what is authorized." *Harrington v. Roundpoint Mortg. Servicing Corp.*, No. 2:15-cv-322-FtM-38MRM, 2017 U.S. Dist. LEXIS 55023, at* 21 (M.D. Fla. Apr. 10, 2017) (citing *Board of Trustees of the City of Delray Beach Police and Firefighters Retirement System v. Citigroup Global Markets, Inc.*, 622 F.3d 1335, 1342-43 (11th Cir. 2010) (finding that the principal's express authorization for its agent to execute the contract implied "the authority to do acts that are incidental to it, usually accompany it, or are reasonably necessary to accomplish it.") (citing 2 Fla. Jur.2d Agency & Employment § 47 (2005))).

Here, the undisputed facts establish that BDC was acting as Defendant's agent and with actual authority. First, Defendant has admitted as much. Second, Defendant signed a contract authorizing BDC to transmit the RVMs at issue. REGAL00001; Spetch Depo. at 23:6-14. Third, Mr. Hallworth, Defendant's then General Manager, had input into the content of the message. Specht Depo. at 39:23-40:3; 58:5-7. Finally, Defendant had the right to control BDC, even if it did not exercise that right. If Defendant had asked BDC to include certain information in the message, BDC would have included it. Specht Depo. at 45:2-7. If Defendant instructed BDC to not send the messages, BDC would have not sent them. Specht Depo. at 45:9-11. BDC would

have complied with instructions from Defendant as to what kind of items to offer as an incentive to visit Defendant's dealerships. Specht Depo. at 45:12-19.

### b. *Defendant Ratified BDC's Conduct*.

"Ratification occurs when a principal knowingly chooses to accept the benefits of unauthorized actions an agent takes on the principal's behalf." *Aranda* 179 F. Supp. 3d at 833 (*citing NECA-IBEW Rockford Loc. Union 364 Health & Welfare Fund v. A&A Drug Co.*, 736 F.3d 1054, 1059 (7th Cir. 2013)).  A defendant may be held liable for ratifying the acts "done by an actor who is an agent or who is not an agent but pretends to be." *Restatement (Third) of Agency* § 4.01 cmt. b. Consistent with the Restatement, courts have held that "a formal agency relationship is not required to establish a party's vicarious liability for the illegal acts of a third-party; plaintiffs can also employ principles of ratification and apparent authority." *Petri v. Mercy Health*, No. 4:15 CV 1296 CDP, 2016 U.S. Dist. LEXIS 167135, at *7-8 (E.D. Mo. Dec. 5, 2016)) (citing *Dish Network*)*; see also Sturm v. Davlyn Invs., Inc.*, No. CV 12-7305-DMG (AGRx), 2013 U.S. Dist. LEXIS 188005, at *7 (C.D. Cal. Nov. 6, 2013)("[b]y ratifying an act, a principal is liable to the extent he would have been 'had the act been that of an agent acting with actual authority.'").

Ratification does not require proof of a pre-existing principle agent relationship: "**ratification may create a relationship of agency when none existed between the actor and the ratifier at the time of the act.** It is necessary that the actor have acted or purported to act on behalf of the ratifier." *Restatement (Third) of Agency* § 4.01 cmt. b (emphasis added); *see also Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 788 (N.D.W. Va. 2017) ("Notably, ratification does not require the existence of an agency relationship. […] It requires only that [plaintiff] prove that [defendant] was aware of [the vendor's] acts and accepted their benefits.") (citing *Restatement (Third) of Agency* § 4.01 cmt. b) (internal quotation marks removed).

13

Ratification occurs in TCPA actions when a defendant did not make the calls at issue but nevertheless accepts a benefit from the telemarking campaign conducted. *See Aranda,* 179 F. Supp. 3d at 833; *see also, Jamison v. First Cred. Servs., Inc.*, 290 F.R.D. 92, 100 (N.D. Ill. 2013) (finding a defendant unlikely to escape vicarious liability because it accepted a monetary benefit from the calls placed); *Dish Network* 28 F.C.C.R.at 6587 ¶ 34 ("seller may be liable for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits.") (*citing* Restatement (Third) of Agency § 4.01, cmt. d.)).   In other words, liability exists when a principal "could drum up business" through the agent's call campaign, even without knowledge of such campaign. *Aranda,* 179 F. Supp. 3d at *13.

To be liable for TCPA violations under a ratification theory, "the principal must either (1) have actual knowledge of all material facts about the agent's act or (2) should have known of the actual facts because a reasonable person under the circumstances would have 'investigate[d] further.'" *Kristensen v. Credit Payment Servs., Inc.*, No. 1:12–cv–00528, 2015 WL 4477425, at *3) quoting Restatement (Third) of Agency § 4.01 cmt. b); *see also Smith v. State Farm. Mut. Auto. Ins. Co.*, 30 F.Supp.3d 765, 779 (N.D. Ill. 2014).  (same); *Murray v. Choice Energy, LLC*, 1:15-CV-60, 2015 WL 4204398, at *6 (S.D. Ohio July 10, 2015) (citing Restatement (Third) of Agency § 4.06); Restatement (Third) of Agency, § 4.06 cmt. d ("A factfinder may conclude that a principal has made such a choice [to ratify] when the principal is shown to have had knowledge of facts that would lead a reasonable person to investigate further, but the principal ratified without further investigation").  However, Defendant does not have to have known that the RVMs violated the TCPA for ratification to apply.  *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 787 (N.D.W. Va. 2017) ("[Defendant] could be liable under a ratification theory if [plaintiff] could prove that "[defendant] was aware of [the vendor's] acts and accepted their benefits — **regardless of**

14

**whether [defendant] knew the calls violated the TCPA.**") (emphasis added).

Defendant does not dispute that it authorized the transmission of the RVMs. Thus, Defendant had knowledge of the requisite material facts, even if Defendant did not realize RVMs violated the TCPA. Further, there is no question that Defendant ratified and accepted the benefits of the subject prerecorded calls. The RVMs BDC sent invited individuals to attend an event at Defendant's dealership, offering them a smartwatch or a cruise ship passage if they did so. Compl. at ¶ 29. Defendant took these items from BDC, had the event at its dealership, and offered these items to individuals who showed up. Specht Depo. 40:14-41:23; First Deposition Transcript of Ken Hallworth ("First Hallworth Depo."), attached as **Exhibit G,** at 40:9-16. According to Mr. Hallworth, the event led to the sale of vehicles. First Hallworth Depo. at 41:1-4. In sum, Defendant knew that BDC was placing unsolicited calls to consumers and accepted the benefits of those marketing activities.

### *2.* **The Role of VoiceLogic**

Defendant is likely to argue that even though it hired BDC to place RVMs, and BDC did exactly that, Defendant cannot be held liable because Plaintiff cannot demonstrate that VoiceLogic was Defendant's agent. It is worth noting that accepting Defendant's position would provide a simple roadmap to all would be violators of the TCPA: (1) hire a vendor to place calls, (2) have that vendor outsource the activities to another vendor. Luckily for consumers, there are three alternative reasons why Defendant is liable for the calls despite VoiceLogic's role.

### a. **VoiceLogic is a Common Carrier and Did Not "Initiate" the Calls**

First, Plaintiff does not have to show vicarious liability between Defendant and VoiceLogic because VoiceLogic is a "common carrier" and did not legally place the calls at issue; BDC did.

The TCPA does not apply to common carriers. The TCPA was intended to "apply to the persons *initiating* the telephone call or sending the message and. . . not to the

common carrier. . . that transmits the call or messages and that is not the originator or controller of the content of the call or message."

*Rinky Dink, Inc. v. Elec. Merch. Sys.*, No. C13-1347-JCC, 2015 U.S. Dist. LEXIS 22108, at *12 (W.D. Wash. Feb. 24, 2015) (*quoting Couser v. Pre-paid Legal Services, Inc.*, 994 F.Supp.2d 1100, 1104 (S.D. Cal. 2014) (emphasis in the original) (citing S.Rep. No. 102-178 (1991), 1991 WL 211220 at *9)). "Common carriers are not liable under the TCPA absent a 'high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions.'" *Rinky Dink, Inc. v. Elec. Merch. Sys.*, No. C13-1347-JCC, 2015 U.S. Dist. LEXIS 22108, at *12 (W.D. Wash. Feb. 24, 2015) (*citing In the Matter of Rules and Regulations Implementing the TCPA of 1991*, 7 FCC Rcd. 8752, 8779-80 (1992)); *see also Allard v. SCI Direct, Inc.*, No. 16-cv-01033, 2017 U.S. Dist. LEXIS 107106, at *8 (M.D. Tenn. July 10, 2017) (holding that the platform provider CallFire did not "initiate" the calls). "A 'high degree of involvement' exists where the broadcaster (1) controls the recipient lists; and/or (2) controls the content of the transmissions." *Payton v. Kale Realty, Ltd. Liab. Co.*, 164 F. Supp. 3d 1050, 1057 (N.D. Ill. 2016) (*quoting Rinky Dink*, 2015 U.S. Dist. LEXIS 22108, 2015 WL 778065, at *7 (citing *Rules and Regulations Implementing the TCPA of 1991*, 68 F.R. 44144-01, 44169 at ¶ 138 (July 25, 2003))).

> Whether or not a party is a "common carrier" is a relatively simple, two-part inquiry: (1) Does the entity hold itself out indifferently to all potential users or, if serving a legally-defined class, hold itself out indiscriminately to serve all within that class; and (2) Does the entity allow customers to transmit messages of their own design and choosing?

*Rinky Dink, Inc. v. Elec. Merch. Sys.*, No. C13-1347-JCC, 2015 U.S. Dist. LEXIS 22108, at *12-14 (W.D. Wash. Feb. 24, 2015) (*citing U.S. Telecom Ass'n v. F.C.C.*, 295 F.3d 1326, 1329-1330, 353 U.S. App. D.C. 59 (D.C. Cir. 2002); *see also Payton v. Kale Realty, Ltd. Liab. Co.*, 164 F. Supp. 3d 1050, 1056 (N.D. Ill. 2016).

Here, the undisputed evidence shows that VoiceLogic is a common carrier and did not have the "high degree" of involvement necessary to disturb the rule that common carriers do not "initiate" calls under the TCPA.  VoiceLogic holds itself out via its publicly available website to serve all potential users of its communications service on the same terms and conditions.  *See* VoiceLogic, About Us, available at https://voicelogic.com/about-us/ (last visited February 3, 2020).  BDC provided VoiceLogic the message and the list of recipients to which the messages were sent.  Specht Depo. at pgs. 11:18-24; 43:5-21; *see also* BDCSubpoenaSuppResp_0890, attached as **Composite Exhibit H**.  BDC determined the timing for when the messages would be sent. Spetton Depott. At pg. 34:7-25; 38:21-39:7; *see also* **Composite Exhibit H** at BDCSubpoenaSuppResp_0887. BDC instructed VoiceLogic which number to display as the caller ID number for the messages. Spetch Depo. at 36:13-21 (citing BDCSubpoenaSuppResp_0888 (where BDC instructs VoiceLogic to "please feature this number on the RVM display[.]")).

Thus, because VoiceLogic is simply a common carrier here, it did not legally "initiate" the calls, BDC did.  Plaintiff has shown that Defendant is vicariously liable for BDC's actions and therefore Defendant legally placed the calls at issue.

### b. Alternatively, Defendant is Vicariously Liable for Voicelogic's Actions because Voicelogic is Defendant's Subvendor

Alternatively, if the Court believes that VoiceLogic "initiated" the calls at issue here, Defendant is still liable for VoiceLogic's actions because VoiceLogic is a "sub-agent" of Defendant.

"If a principal is responsible for its agent's actions, the principal is also responsible for the actions of its agent's agents (i.e., the principal's subagents)." *Hartford Fire Ins. Co. v. Clark*, 727 F. Supp. 2d 765, 774 (D. Minn. 2010). The Restatement (Third) of Agency describes a subagent as "a person appointed by an agent to perform functions that the agent has consented to perform

on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal." Restatement (Third) Of Agency § 3.15(1).  Further,

> An agent has actual authority to create a relationship of subagency when the agent reasonably believes, based on a manifestation from the principal, that the principal consents to the appointment of a subagent. […] A principal's consent to the appointment of a subagent may be express or implied.

Restatement (Third) Of Agency § 3.15, comment C; *see also Green v. United States*, 418 F. App'x 862, 868 (11th Cir. 2011) ("An agent must have 'actual or apparent authority' to appoint a subagent[.]") (citing Restatement. (Third) Of Agency § 3.15(2)); *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 924 (C.D. Ill. 2017)*; Desai v. ADT Sec. Sys.*, 78 F. Supp. 3d 896, 904 (N.D. Ill. 2015). Finally,

> As between a principal and third parties, it is immaterial that an action was taken by a subagent as opposed to an agent directly appointed by the principal. In this respect, subagency is governed by a principle of transparency that looks from the subagent to the principal and through the appointing agent. As to third parties, an action taken by a subagent carries the legal consequences for the principal that would follow were the action instead taken by the appointing agent.

Restatement (Third) Of Agency § 3.15, comment D.

Here, the evidence shows that BDC had authority to appoint VoiceLogic as a sub-agent. The contract that BDC sent to Defendant for the RVMs at issue, and which Defendant signed, clearly states, "This commitment is to serve as written authorization for BDC Promotions, Inc. to perform services and/or contract with third parties to complete the sales event described above." REGAL00001; Specht Depo. at 23:6-14. Because, as shown above, BDC was Defendant's agent, and BDC had authority to appoint a sub-agent, "[Defendant] is also responsible for the actions of its agent's [BDC's] agents [VoiceLogic] (i.e., the principal's subagents)." *Hartford Fire Ins. Co. v. Clark*, 727 F. Supp. 2d 765, 774 (D. Minn. 2010).

### c.   Defendant Ratified VoiceLogic's Actions

18

Finally, Defendant can be held liable for VoiceLogic's actions under the theory of ratification. See *supra* at pgs. 11-14. As discussed above, Defendant took the benefits of the RVMs and held an event at its dealership in which some vehicles were sold. By doing so, Defendant ratified Voicelogic's actions in placing the RVMs.

**B.** **"Ringless" Voicemails are Calls**.

To date, every court that has examined the issue has determined that ringless voicemails are "calls" subject to the TCPA. *See Schaevitz v. Braman Hyundai, Inc.*, No. 1:17-cv-23890-KMM, 2019 U.S. Dist. LEXIS 48906, at *8 (S.D. Fla. Mar. 25, 2019) ("'ringless' voicemail, that is, a direct to voicemail message is a 'call' under the TCPA."); *Picton v. Greenway Chrysler-Jeep-Dodge, Inc.*, No. 6:19-cv-196-Orl-31DCI, 2019 U.S. Dist. LEXIS 103796, at *5 (M.D. Fla. June 21, 2019) ("[T]he Court rejects the argument that voicemails, or ringless voicemails, are not subject to the TCPA."); *Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907, 911 (W.D. Mich. 2018) ("Dyck O'Neal's use of direct to voicemail technology is a 'call' and falls within the purview of the TCPA."); *Dickson v. Direct Energy, LP*, No. 5:18CV182, 2019 U.S. Dist. LEXIS 96938, at *7 (N.D. Ohio Mar. 18, 2019); *Saunders v. Dyck O'Neal, Inc.*, No. 1:17-cv-00335, 2020 U.S. Dist. LEXIS 13262, at *3-4 (W.D. Mich. Jan. 22, 2020) (reaffirming previous ruling and rejecting argument that because RVMs go directly to a voicemail box the TCPA does not apply). Respectfully, this Court should as well.

"[B]ecause the TCPA is 'a consumer protection statute which is remedial in nature,' this Court must interpret the statute broadly." *Heard v. Nationstar Mortg. LLC*, No. 2:16-cv-00694-MHH, 2018 U.S. Dist. LEXIS 143175, at *15 (N.D. Ala. Aug. 22, 2018) (quoting *Carmichael v. Nissan Motor Acceptance Corp.*, 291 F.3d 1278, 1280 (11th Cir. 2002) (noting that remedial statutes "must be construed liberally in order to best serve Congress' intent.") (internal quotation

marks omitted)).  In other words, the TCPA "should be construed to benefit consumers."  *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013) (citing *Lesher v. Law Offices of Mitchell N. Kay, PC*, 650 F.3d 993, 997 (3d Cir. 2011)).

A construction of the TCPA that includes "ringless" voicemails as calls, particularly given that the technology operates just like text messaging, is consistent with the remedial nature of the statute and the requirement that it be interpreted broadly to benefit consumers.  A contrary interpretation would result in serious harm to consumers and would leave them without recourse given that they can do nothing to block these intrusive communications.

### 1.  A "Ringless" Voicemail is a Call as a Matter of Law.

The TCPA makes it unlawful "to make any call" using a prerecorded message without the recipient's prior express consent.  47 U.S.C. §227(b)(1)(A).  Because the TCPA does not define the term "call," courts interpret the word "according to its 'ordinary, contemporary, common meaning.'"  *Schaevitz*, 2019 U.S. Dist. LEXIS 48906, at *10 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.")).  The word "call" is defined as "to communicate with or try to get into communication with a person by a telephone."  *Schaevitz*, 2019 U.S. Dist. LEXIS 48906, at *11 (quoting *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953-54 (9th Cir. 2009)).  "A construction of the TCPA in which a 'ringless' voicemail is a 'call' is consistent with Congress's purpose in enacting the TCPA."  *Schaevitz*, 2019 U.S. Dist. LEXIS 48906, at *14-*15.  "Accordingly, the Court finds that the 'ringless' voicemail, that is, a direct to voicemail message is a 'call' under the TCPA."  *Id*. at *15; *see also Saunders*, 319 F. Supp. 3d at 911 ("By leaving a voicemail directly in the server space associated with Saunders' phone, Dyck O'Neal was attempting to communicate with Saunders"

and thus the "use of direct to voicemail technology is a 'call' and falls within the purview of the TCPA.").

Chief Judge Moore's reasoning in *Schaevitz* is consistent with the fact that a communication need not be made by a telephone in order to fall within the ambit of the TCPA. Indeed, this point was recognized by the FCC when it analyzed whether using a computer to communicate with a cell phone subscriber via a text message is a covered "call" under the TCPA. The FCC found that even when the computer "dials" the cell phone number such that the message is not initiated from a telephone, the message is considered to be a "call" under the TCPA. *See In the Matter of Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 8019 (2015).

In this case, the fact that the subject calls were placed by computer equipment is immaterial. More importantly, the facts establish that the "ringless" voicemails utilized by Defendant are calls within the plain definition of the word in that they were an attempt "to communicate with or try to get into communication with a person by a telephone." *Saunders*, 319 F. Supp. 3d at 910 (quoting *Satterfield*, 569 F.3d at 953-54).

In other words, the campaign was an attempt by Defendant to communicate with Plaintiff and class members through their telephones in order to promote Defendant's dealership. Defendant intended for recipients of these calls, including Plaintiff, to listen to the message and visit one of Defendant's dealerships. Spetch Depo. at 17:5-19; 25:18-21. Thus, it is undisputed that Defendant was attempting to communicate through a telephone.

### 2. A "Ringless" Voicemail is the Same as a Missed Voice Call Followed by a Voicemail.

"Courts have consistently held that voicemail messages are subject to the same TCPA restrictions as traditional calls." *Saunders,* 319 F. Supp. 3d at 909 (*citing Soppet v. Enhanced Recovery Co.*, 679 F.3d 637 (7th Cir. 2012) (awarding statutory damages for all calls received,

including voicemails); *Powell v. West Asset Mgmt. Inc.*, 773 F. Supp. 2d 761 (N.D. Ill. 2011); *Castro v. Green Tree Servicing LLC*, 959 F. Supp. 2d 698, 720 (S.D.N.Y. 2013). In fact, courts have held that a traditional voice call followed by a voicemail, as well as a missed call followed by voicemail, are both actionable under the TCPA because whether the plaintiff answers the call is immaterial. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1270 (11th Cir. 2019) (noting the Eleventh Circuit's agreement with the Third Circuit that "the receipt of a single unsolicited call to a cell phone and a voicemail recording constituted an injury in fact.") (*citing Susinno v. Work Out World Inc.*, 862 F.3d 346, 351- 52 (3d Cir. 2017) (finding Article III standing where plaintiff received a prerecorded voicemail)); *Powell,* 773 F. Supp. 2d at 761 (concluding that unanswered calls and accompanying voicemail messages were violations of the TCPA); *Castro*, 959 F. Supp. 2d at 720 (S.D.N.Y. 2013) (holding that it was immaterial whether the plaintiff answered the defendants' calls or whether the calls went to voicemail).

Pursuant to this line of cases, the "ringless" voicemails at issue here are considered calls governed under the TCPA. If the answering of the call is immaterial as held by these various courts, then the fact that a traditional voice call is not made in the transmission of a "ringless" voicemail is immaterial. To a consumer, a missed call followed by a voicemail and "ringless" voicemail are exactly the same. Both result in an unwanted voicemail being deposited into their voicemail box. As held by the court in *Saunders*, it is the actual prerecorded voicemail that is the violation. 319 F. Supp. 3d at 909. The fact that Defendant did not place a traditional voice call is immaterial. Defendant is liable under the TCPA because it sent prerecorded voicemails to Plaintiff and class members, which are actionable under the TCPA. In fact, a "ringless" voicemail is even more intrusive than a traditional voice call in that there is nothing consumers can do to prevent or block their phones from receiving the messages. *See Johnson v. Comodo Grp.*, No. 16-4469

(SDW) (LDW), 2020 U.S. Dist. LEXIS 18033, at *17 (D.N.J. Jan. 31, 2020) ("More specifically, multiple courts, including the Third Circuit, have held that prerecorded messages left on voicemail can incur TCPA liability.").

### C.   <u>Defendant Sent Calls to Plaintiff's and the Class Members' Cellular Telephones</u>.

Initially, the TCPA does not require that "the recipient of a call . . . answer the phone or somehow be aware of the call." *Schaevitz*, 2019 U.S. Dist. LEXIS 48906, at *14 (quoting *Fillichio v. M.R.S. Assocs., Inc.*, No. 09-61629-CIV-JORDON, 2010 U.S. Dist. LEXIS 112780, at *8 (S.D. Fla. Oct. 19, 2010)).  "Rather, 'it is the mere act of placing the call that triggers the statute.'"  *Id*. In other words, a "violation of the TCPA occurs at the moment the [calls] were allegedly sent." *Mohamed v. Off Lease Only, Inc.*, 320 F.R.D. 301, 312 (S.D. Fla. 2017); *see also Hinman v. M & M Rental Ctr., Inc.*, 596 F.Supp.2d 1152, 1159 (N.D. Ill. 2009) (reading a "receipt" requirement into the TCPA "imports elements that neither Congress, nor the FCC, nor any soundly reasoned authority has stated are part of a TCPA claim.").

Here, it is undisputed that BDC only purchased cellular telephone numbers from List Service for the RVM campaign.  Specht Depo at. 24:10-16.  It is also undisputed that the prerecorded calls were successfully made to 5,997 unique cellular telephone numbers.  Hiraldo Decl. at ¶ 12.   Thus, there is no dispute that calls were <u>sent</u> to the cellular telephones of Plaintiff and members of the class.

### D.   <u>Defendant's Calls Were for Purposes of Marketing</u>.

The TCPA regulations promulgated by the FCC define "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. §64.1200(f)(12).  In determining whether a communication constitutes telemarketing, a court must evaluate the ultimate purpose of the

communication.  *See Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015).

There is no dispute that Defendant's prerecorded calls fall within the FCC's definition of telemarketing.  On its face, the RVM is marketing. Further, the RVM was sent to Plaintiff for purposes of marketing Defendant's business.  Campisi Depo. at 23:11-24:4; Specht Depo. at 17:5-10; 21:13-17

### E.  Defendant Failed to Obtain Express Written Consent.

"Express consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof."  *Keim v. ADF MidAtlantic, Ltd. Liab. Co.*, 328 F.R.D. 668, 681 (S.D. Fla. 2018) (citing *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017)).  Effective October 16, 2013, a "call that includes or introduces an advertisement or constitutes telemarketing" requires the "the prior express **written** consent of the called party."  47 C.F.R. §64.1200(a)(2) (emphasis supplied); *see also Snyder v. Icard Gift Card, LLC*, No. 0:15-CV-61718-WPD, 2016 U.S. Dist. LEXIS 191212, at *11-*12 (S.D. Fla. May 16, 2016) (quoting 47 C.F.R. §64.1200(f)(8)).  "[U]nder binding FCC regulations, 'prior express written consent' can be obtained only after providing the recipient with the required disclosures that they agree to receive automated telephone advertisements and that agreeing to receive such calls is not required to make a purchase."  *Snyder*, 2016 U.S. Dist. LEXIS 191212, at *13.

Based on the record evidence, there is no question that Defendant failed to obtain the requisite consent. Because BDC purchased a randomly compiled list of cellular telephone numbers for consumers, Defendant, nor any of the third parties it contracted with, obtained Plaintiff's or Class member's express consent, let alone the requisite express *written* consent, to contact them on their cellular telephones with prerecorded marketing messages. Specht Depo. at 51:22-52:18; Campisi Depo. at 36:9-23. In fact, at no point in time did Defendant do anything to confirm

whether BDC had secured express written consent from recipients of the RVMs before they were sent. *Id.*

V.   **CONCLUSION**

**WHEREFORE**, Monifa Grant, on behalf herself and the class members, respectfully requests the entry of summary judgment against Defendant in the amount of $500 per "ringless" voicemail sent by or on behalf of Defendant, and for such other relief as deem appropriate by the Court.

Dated:  February 10, 2020

Respectfully Submitted,

**IJH Law**

/s/ *Ignacio J. Hiraldo*
Ignacio J. Hiraldo, Esq.
Florida Bar No. 0056031
1200 Brickell Ave Suite 1950
Miami, FL 33131
Email: ijhiraldo@ijhlaw.com
Telephone: 786.496.4469

**EDELSBERG LAW, PA**
Scott Edelsberg, Esq.
Florida Bar No. 0100537
scott@edelsberglaw.com
19495 Biscayne Blvd #607
Aventura, FL 33180
Telephone: 305-975-3320

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis
Florida Bar No. 101754
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 400
Miami, Florida 33132
(t) (305) 479-2299

**Counsel for Plaintiff and the Class**

**HIRALDO P.A.**

Manuel S. Hiraldo
Florida Bar No. 030380
401 E. Las Olas Boulevard Suite 1400
Ft. Lauderdale, Florida 33301
Email: mhiraldo@hiraldolaw.com
Telephone: 954-400-4713
**Trial Counsel**

**EISENBAND LAW, P.A.**
Michael Eisenband
Florida Bar No. 94235
515 E. Las Olas Boulevard, Suite 120
Ft. Lauderdale, Florida 33301
MEisenband@Eisenbandlaw.com
Telephone: 954.533.4092

25