**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MONIFA GRANT
*on behalf of herself and all*
*others similarly situated,*

Plaintiff,

v.                                                              Case No.: 8:19-cv-00363-JSS

REGAL AUTOMOTIVE GROUP, INC
D/B/A REGAL HONDA,

Defendant.
_____/


**Defendant's Response to Plaintiff's Motion for Approval of Class Notice Plan**


GOLDEN SCAZ GAGAIN, PLLC
201 North Armenia Avenue
Tampa, Florida 33609


*Attorneys for Defendant*
*Regal Automotive Group, Inc.*

## <u>TABLE OF CONTENTS</u>

Page

I.     INTRODUCTION……………………………………………………………1

II.    LEGAL STANDARD……..………………………………………………1

III.   ARGUMENT…………………………………………………………………1

        1.     Grant's proposed notice plan is both overinclusive and underinclusive
               as not reasonable method to identify actual class members is included…..1

        2.     Plaintiff has provided the Court no *evidence* supporting the viability
               Of her proposed notice plan…………………………………………...11

IV.   CONCLUSION………………………………………………………………15

Page(s)

Cases

*Bonner v. City of Prichard, Ala.*,
   661 F.2d 1206 (11th Cir.1981) (*en banc*........................................................... 9, 10, 11
*In re Advanced Methods to Target and Eliminate Unlawful Robocalls,* CG Docket No. 17-59,
   FCC 18-177, (Dec. 12, 2018)........................................................................... 7
In re Chiquita Brands Int'l Inc. Alien Tort Statute & Shareholders Derivative Litig.,
   331 F.R.D. 675 (S.D. Fla. 2019)...................................................................... 12
*In re Nissan Motor Corp. Antitrust Litig.,*
   552 F.2d 1088 (5th Cir. 1977) ........................................................................ passim
*Jackson v. Hartford Life & Acc. Ins. Co.*,
   543 Fed. Appx. 977 (11th Cir. 2013)................................................................ 14
*Karhu v. Vital Pharm., Inc.*,
   621 Fed. Appx. 945 (11th Cir. 2015)................................................................ 12
*Mayes v. City of Hammond*,
   442 F. Supp. 2d 587 (N.D. Ind. 2006) .............................................................. 13, 14
*McCaskill v. Navient Sols., Inc.*,
   178 F. Supp. 3d 1281 (M.D. Fla. 2016)............................................................. 7, 9
*Mullane v. Cent. Hanover Bank & Tr. Co.*,
   339 U.S. 306 (1950)......................................................................................... 2
*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ........................................................................... 12
*Sun Prot. Factory, Inc. v. Tender Corp.*,
   2005 WL 2484710 (M.D. Fla. Oct. 7, 2005) ..................................................... 14, 16
*United States v. Vernon*,
   593 F. App'x 883 (11th Cir. 2014) ................................................................... 13

i

*Walewski v. Zenimax Media, Inc.*,
   502 Fed. Appx. 857 (11th Cir. 2012) ........................................................................ 2, 5

Other Authorities

DE 110 ............................................................................................................................. 13
DE 129 ............................................................................................................................. 13
DE 140 ........................................................................................................................... 3, 11
DE 144 ............................................................................................................................. 13
DE 148 ................................................................................................................ 4, 5, 14, 15

## I.   Introduction

Binding precedent establishes that a class notice plan that is both overinclusive and underinclusive is fatally defective. Only those persons who received the Regal voicemail message on their cellular telephones are class members. Yet Grant's plan provides no means to identify actual cellphone owners. She instead proposes relying on inaccurate data that would result in overinclusive and underinclusive class notice and provides no means for Regal exercise its due process right to challenge class membership.

## II.  Legal Standard

The Supreme Court has held: "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[1] Rule 23(c)(2)(B) requires "individual notice to all members who can be identified through reasonable effort."[2] A notice plan that fails to provide notice to members, while also providing notice to non-members is fatally defective.[3]

## III. Argument

**1.  Grant's proposed notice plan is both overinclusive and underinclusive as no reasonable method to identify actual class members is included.**

For Grant's plan to be acceptable, it must provide a reliable means to identify those persons who owned cell phone numbers that were allegedly called during a two-day period in October 2017. As feared by Regal, Grant proposes identifying class members and sending notices in blind reliance on a data collected by List Service. That data—consisting of random phone numbers and names—is demonstrably incapable of accurately tying telephone numbers to

---

[1] *Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 306, 314 (1950).
[2] *Id.*
[3] *See, In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088, 1099 (5th Cir. 1977).

owners of numbers assigned to cellular service at the time messages were sent. If the Court approves this method, the result will be an improper class notice plan that is both impermissibly over-inclusive and under-inclusive.[4]

The Court will undoubtedly recall Defendant arguing in opposition to class certification that Grant "claims this Court can rely solely on unreliable records to identify class members" in its response to the Motion for Class Certification.[5] The "unreliable records" referenced by Regal were documents containing the data collected by List Service and sent to BDC Productions, who then sent the same data to Voice Logic—the entity that sent the RVMs at issue. List Service took no steps to determine, much less ensure, the names associated with phone numbers were the actual accountholders in October 2017.[6] And there is no evidence to even suggest BDC Productions or Voice Logic took any measures to: 1) determine whether the List Service data accurately identified accountholders  in October 2017; or 2) otherwise attempted to independently compile an accurate list of accountholders for the cellular telephone numbers receiving RVMs. Stated simply, while the List Service data changed hands more than once, there is no evidence suggesting it ever changed in substance. This means any "reports" related to the RVM campaign, like the "Campaign Reports" reference in Plaintiff's Motion for Class Certification, are based entirely on the List Service data in terms of telephone numbers and associated names.

When Regal suggested to the Court in its response to Grant's Motion for Class Certification that she proposed relying solely on the List Service data to identify class members, the Court rebuked Defendant stating, "the plaintiff claims nothing of the sort."[7] And while the

---

[4] *Walewski v. Zenimax Media, Inc.*, 502 Fed. Appx. 857, 861 (11th Cir. 2012) (unpublished).
[5] *See,* DE 60 at p. 9.
[6] *See*, DE 60-1, Decl. of Allen Shapiro, Vice President of List Service, Inc.
[7] *See,* DE 140 at p. 7.

Court, in reviewing Grant's Motion for Class Certification, may have been lead to believe Grant didn't intend to rely solely on that data, that's precisely what she proposes to do now in her notice plan.

In its Order granting certification, the Court stated that if the List Service data wasn't accurate—and there's never been any evidence suggesting it's even been accurate—it would at least provide "a workable 'starting point' from which to identify a class." And, according to the Court, "the  plaintiff posits that she can ascertain class members by employing two other methods — 'reverse-appending' and subpoena — each of which carries precedential approval."[8] Later in its Order, the Court specifically touted "reverse-appending and subpoena" as two approved methods for verifying the class members.[9] Neither method is proposed by Grant in the motion at bar. She, in fact, fails to suggest *any* method to "verify[] the class member" in her proposed plan and provides no means for Regal to challenge membership. Instead, as revealed in her Motion, Regal's claim that Grant intends to "rely solely on unreliable records to identify class members" was prophetic.

The Motion contains nothing suggesting Grant will "ascertain class members by employing two other methods — 'reverse-appending' and subpoena." The substance of the notice plan consists of the following steps:

> (1) address update and validation for the class members' addresses; (2) mailed short-form postcard notice to all Class Members; (3) e-mail lookup and e-mail notice to all Class Members for which email addresses are found; (4) the creation of a dedicated website that will house long form notice, important case documents, deadlines, answers to frequently asked questions, and additional contact information; and (5) a telephone line featuring an interactive voice response system to handle Class Members' inquiries.[10]

---

[8] *Ibid.* at p. 7.
[9] *Ibid.* at p. 10.
[10] *See*, DE 148 at p. 2.

No attempt will be made to determine if the names in any "report" belonged to the owner of the phone numbers adjacent to that name during the two-day period in 2017. Grant will instead only try to obtain current mailing and emailing addresses for persons included in the List Service Data. Hence, Defendant's earlier claim that Grant improperly intended to "rely solely on unreliable records to identify class members" has now been fully vindicated by Grant's own notice plan that proposes relying solely on the List Service data to identify class members – without any mention of the use of "reverse append" or the employment of subpoenas.

The data was collected by List Service in October 2017. There is no evidence supporting Grant's implicit claim that List Service endeavored to compile data that accurately lists the names of the cell phone number owners. And there was no need for this procedure to be employed because the message was generic and not personalized to the recipients.[11] All Voice Logic needed was numbers to be called. And the evidence, in fact, proves the List did not accurately correlate owner names to telephone numbers even at the time it was created.[12]

According to Shapiro the List Service data was merely "derived from publicly available sources" and List Service admitted that it made no attempt "to determine whether any of the telephone numbers provided actually belonged to the person listed as the owner/subscriber of the number on the list."[13] That is, "if the list indicated 789-555-1212 belonged to John Smith, 1234 Main Street, Anywhere, Florida, List Service did nothing to determine whether the number actually belonged to John Smith at that address."[14]

In the declaration, Shapiro acknowledges that BDC requested List Service provide "cellular telephone numbers" and that List Service responded by providing 15,691 telephone

---

[11] The complete transcript of the recorded message is set forth in DE 148 at p. 1.
[12] *See*, DE 60-1, Declaration of Allen Shapiro.
[13] *Ibid.*
[14] *Ibid.*

numbers which it believed were assigned to cellular service. The evidence, however, shows that thousands of the numbers were likely *not* assigned to cellular telephone service.

According to Grant's counsel, "the technology at issue – RVM – works by delivering targeted, prerecorded telemarketing voice messages *en masse* to the voicemail boxes of cellular subscribers."[15] This statement made by counsel is, of course, not evidence, and the fact remains that Grant has produced no evidence showing how Voice Logic's technology works. So, her counsel's statement is simply a guess. But assuming, *arguendo*, counsel's guess is right and Voice Logic's technology sends RVMs exclusively to cellular numbers and not landlines, additional "evidence" offered by Grant's counsel in a declaration further supports the conclusion the List Service data cannot be relied on to identify the owners of cellphone numbers during the relevant two-day period in 2017.

Counsel's Declaration in support of his client's Motion for Class Certification claims Voice Logic "attempted to send 14,032 RVMs to consumer," but only "5,997 unique numbers" allegedly received messages.[16] In other words, roughly 8,000 of the original 14,000 numbers List Service collected in its efforts to provide BDC with cellphone numbers were unable to receive messages from Voice Logic. At least one fair conclusion to reach is that this outcome was likely caused by RMVs being attempt to numbers that were not assigned to cellular service, i.e. landlines.[17] It also then follows that if List Service was unable to accurately identify numbers assigned to cell service there's also no reason to believe it accurately tied the telephone numbers to subscribers, either.

---

[15] *See,* DE 99 at p. 2.

[16] *See*, DE 52-2 at ¶ 9, 12.

[17] *See*, Plaintiff's Motion for Summary Judgment, DE 99 at p. 2 ("the technology at issue – RVM – works by delivering targeted, prerecorded telemarketing voice messages *en masse* to the voicemail boxes of cellular subscribers.") Of course, since Grant presented no evidence how Voice Logic's technology works, her counsel's statement is simply a guess.

Grant hasn't produced evidence showing any data produced in this case accurately indicates the name of even a *single* owner of any cellphone number at the time a message was sent—not even herself. As demonstrated above, in fact, there's substantial evidence showing the data cannot be relied on to accurately identify the owners of the cellphone numbers during the two-day period in 2017 when the messages at issue were sent. And there's more evidence supporting this conclusion.

The Federal Communications Commission has determined that "[a]pproximately 35 million numbers are disconnected and made available for reassignment to new consumers each year."[18] That's nearly 3 million reassignments per month meaning, in the FCC's words, "a number used by one consumer today can be reassigned to another consumer almost immediately."[19] This, when added to the facts detailed above, amplifies Regal's concerns about relying on the List Service data to identify accountholders names and addresses as they were in October 2017.[20] Add to that the fact List Service used "publicly available sources," did nothing to try to ensure the List accurately tied names to cell numbers, and claimed to have provided nothing but cell numbers, yet Voice Logic was only able to send RVMs to less than half those numbers, and the fallibility of Grant's reliance exclusively on that data List to identify and notice class members becomes overwhelmingly obvious.

The difficulties the FCC has experienced in trying to create a database to accurately track cellphone number reassignment is also instructive. In March 2018, the Commission announced

---

[18] *See*, Ex. 1, *Second Report and Order, In re Advanced Methods to Target and Eliminate Unlawful Robocalls,* CG Docket No. 17-59, FCC 18-177, ¶ 6, (Dec. 12, 2018).
[19] *Ibid.* at ¶ 14.
[20] Even if the List Service data accurately identified cellphone accountholders, the notice plan would be defective as it would provide no notice to "users" of the cellphone numbers, who also have standing to bring TCPA claims. *See, McCaskill v. Navient Sols., Inc.,* 178 F. Supp. 3d 1281, 1290 (M.D. Fla. 2016) (concluding both "the consumer assigned the telephone number dialed and billed for the call" and the "customary user of a telephone number included in a family or business calling plan" have standing to bring TCPA claims for calls to the number.)

its intention to create a "reassigned number database" that—it more recently indicated—would "enable any caller to verify whether a telephone number has been reassigned before calling that number."[21] Once the database was created, telephone service providers would be required "to report the last date of permanent disconnection associated with their allocated and ported-in numbers to a reassigned numbers database administrator to track changes in cellphone number ownership."[22] And while the Commission was originally optimistic, stating last year that "[c]allers using the database will be able to find out if telephone numbers assigned to consumers who want their calls have been disconnected and made eligible for reassignment,"[23] it has essentially admitted the database will not be complete and will, in fact, include an indication of "no data" signifying "the database does not contain the relevant data to determine whether the number has been disconnected during the time of the query."[24]

At bottom, even though the federal government is investing an untold amount of time, effort, and taxpayer dollars into creating an accurate database of reassigned numbers, no such database will likely exist for the foreseeable future (if ever). Yet Grant claims the List Service data, cobbled together by a private business entity with no checks in place to ensure the numbers were actually cell numbers, and no concern whether the numbers belonged to the names associated with them in that data, can be relied upon in this case to protect Regal's due process rights in providing class notice.

If that weren't enough, there is direct evidence showing the List Service data does not accurately associate numbers with subscribers as of October 2017. First and foremost, the name of the Plaintiff "Monifa Grant" appears nowhere in the List Service data, yet she testified she

---

[21] *See,* Ex. 1 at ¶ 2.  2, FCC's April 16, 2020 Public Notice (CG Docket No. 17-59) at ¶ 3.
[22] *Ibid.* at ¶ 11.
[23] *See* Ex. 1, Appendix C, at ¶ 3.
[24] *See,* Ex. 2 at p. 2.

received a voicemail. This fact alone demonstrates the data cannot reliably form the basis for identify class members or providing class notice because the class representative is not even on the list.

And the Declaration of Jan Kostyun, who has provided expert testimony in several TCPA cases, shows the List Service data cannot be relied on to accurately identify the owners of cell numbers in October 2017.[25] Kostyun, ran 50 names and numbers from the data through TransUnion's "commercial database with the advertised capability to identify user or subscriber names, based on a telephone number and a specific historic timeframe."[26] TransUnion "compare[d] the provided telephone numbers provided against its data repositories, and return[ed] up to five names, addresses and date ranges associated with each telephone number."[27] Kostyun then performed a comparison between the two sets of data, to identify the telephone numbers for which the source data's first and last names matched a first and last name from TransUnion for that same number" and found "that only 28 of the 50 telephone numbers included matching criteria between the [List Service data] and TransUnion's output – i.e. the first and last names from the source data matched the first and last name from TransUnion for 28 telephone numbers, where the date range for those names from TransUnion also included the October, 2017 timeframe."[28]

Accordingly, the class notice method proposed here by Grant "is defective in two aspects" because it is both overinclusive and underinclusive.[29] If Grant has her way, notice will

---

[25] While the court refused to consider Kostyun's Declaration in ruling on the Motion for Class Certification finding it "untimely," it is not untimely for purposes of responding to Plaintiff's Motion for Approval of Class Notice Plan.
[26] *See,* Ex. 3, Kostyun Decl.
[27] *Ibid.*
[28] *Ibid.*
[29] *See, In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088, 1099 (5th Cir. 1977). The Eleventh Circuit Court of Appeals adopted as binding precedent all prior decisions of the former Fifth Circuit Court of Appeals issued prior to October 1, 1981. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*).

be sent to addresses associated with persons whose names and addresses appear in the Lister Service data regardless of whether any of those persons actually owned the cellphone number at the time the RVM was sent. Hence, it's overinclusive.

And conversely, no notice will be sent to any person not included in the List Service data, i.e. any person that was the accountholder but was not indicated as such on the List, nor any "users" since persons "included in a family or business calling plan" wouldn't be listed in any cellular carriers records which would naturally be limited to listing the accountholder. This defect renders Grant's proposed notice method impermissibly underinclusive.[30]

In *Nissan Motor Corp.,* the district court certified a class composed solely of "*original retail purchasers of approximately 371,000 new Datsun motor vehicles.*"[31] And while Nissan would have been able to provide names and addresses for all original purchasers, doing so would have required a manual review 1.7 million owner records.[32] The plaintiffs nonetheless urged the district court to order Nissan to review those records and produced the names and addresses of original purchasers. Nissan instead asked the court to allow it to produce only the names and addresses of "*current owners* of Datsun motor vehicles" stored in easily accessible computer records. The district court sided with Nissan "[d]espite the fact that no correlation was shown to exist between the class of original retail Datsun purchasers and the class of current, registered Datsun owners."[33]

In addressing the plaintiffs' appeal, the Old Fifth Circuit found the proposal to send notice only to those persons on the computer-based "current owners" list wanting since it "probably omits substantial numbers of the certified class of original retail purchasers of Datsun

---

[30] *Id.*
[31] *Id.* at 1092.
[32] *Id.* at 1094.
[33] *Id.* at 1096.

motor vehicles whose names will not be included in Nissan U.S.A.'s computer printout of current registered Datsun owners because they have transferred the ownership of vehicles they purchased."[34] This, according to the court, created "[a] danger [] that class members who are not included in the computer printout of current registered owners" would not be mailed a notice and would not see the proposed published notice.[35]

The Court found the class notice plan was therefore defective "in two aspects:"

> Current, registered Datsun owners is an overinclusive group. While it includes any original retail Datsun purchasers of the class who have continued to keep their vehicle, it also includes the present owner of every Datsun acquired in the United States since February 27, 1973. Since no evidence was produced to show what percent of the names and addresses of class members might appear on the proposed computer printout list, it is impossible to estimate how many absentees class members would receive individual notice. It seems likely that mailing notice to every person listed in any California metropolitan telephone book could notify as many class members.

> A more fundamental defect, however, is that the class notice is underinclusive. Even though their names and addresses are on RDR cards, class members who no longer own the vehicles they purchased will not receive individual notice.[36]

The same defects exist in Grant's proposed notice plan relying solely on the List to identify who will receive notice. The class here is composed exclusively of persons who "were delivered the prerecorded voicemail *to their cellular telephone*."[37] But here, as in *Nissan*, "no correlation was shown to exist between the class" of cellphone owners and the persons whose names appear in the List Service data.[38] That means relying on the List Service data will generate overinclusive notice since—as demonstrated by the Kostyun Declaration—the List

---

[34] *Id.* at 1095.
[35] *Id.*
[36] *Id.* at 1099-1100.
[37] *See*, DE 140 at p. 13. (emphasis added)
[38] *See, In re Nissan,* 552 F.2d 1096.

includes persons that were neither the subscriber nor user of the cellphone number at the time the message was sent. And using the List would also result in "class notice [that] is underinclusive" because persons who received the prerecorded voicemail on their cellular telephones but not indicated as a cellphone owner in the List Service data "will not receive individual notice."

There's another problem with Grant's proposed plan. Regal's "due-process rights … allow[] [it] to challenge each claimant's class membership."[39] Yet Grant's plan not only fails to provide a method to determine whether any person receiving notice is actually a class member, but it also implicitly "deprive[s] Defendant[] of [its] ability to challenge class membership … implicat[ing] serious due process concerns."[40] Grant has proposed sending class notice to every person in the List Service data, yet there is no evidence the data is accurate. Yet Grant has proposed no method guaranteeing Regal the "ability to challenge class membership."[41]

Her failure to acknowledge this defect in her plan, much less "established how the potential problems … would be avoided," dooms her notice plan since protecting Regal's rights to challenge class membership would require a "series of mini-trials just to evaluate the threshold issue of which [persons] are class members."[42] Because the evidence shows the List is both underinclusive and overinclusive, the notice plan proposed by Grant must be rejected.[43]

### 2. Plaintiff has provided the Court no *evidence* supporting the viability of her proposed notice plan.

At the risk of sounding like a broken record: Grant has failed to provide the Court with *evidence* supporting the relief sought in her motion. As been her consistent yet improper practice

---

[39] *See, Karhu v. Vital Pharm., Inc.*, 621 Fed. Appx. 945, 949 (11th Cir. 2015) (unpublished).

[40] In re Chiquita Brands Int'l Inc. Alien Tort Statute & Shareholders Derivative Litig., 331 F.R.D. 675, 685 (S.D. Fla. 2019).

[41] *Id.*

[42] *Id.* ("Because Karhu had not himself proposed an affidavit-based method, he necessarily had not established how the potential problems with such a method would be avoided."); *see also*, *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015) ("defendant must be "given a fair opportunity to challenge the claim to class membership.")

[43] *See, In re Nissan Motor Corp.*, 552 F.2d 1088.

in this case, she again relies solely on statements of counsel, this time coupled with a "printout" purported to be from a proposed vendor's website to argue her notice plan satisfies Rule 23.

In April of this year, the Court made clear its understanding that statements of counsel are not evidence, stating:

> Statements and arguments of counsel do not constitute evidence. *See, e.g.*, *United States v. Vernon*, 593 F. App'x 883, 887 (11th Cir. 2014). As a result, courts routinely disregard arguments that are not supported by evidence. *See, e.g.*, *Mayes v. City of Hammond*, 442 F. Supp. 2d 587, 596 (N.D. Ind. 2006) ("[I]t is the function of a court, with or without a motion to strike, to review carefully both statements of material facts and statements of genuine issues and the headings contained therein and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement.")[44]

There's nothing unclear in the Court's Order, yet months later, Grant has continued her practice of submitting the "testimony" of her attorneys in support of motions seeking relief from the Court. Not to belabor the point, but in support of her Motion for Class Certification, Grant improperly relied on unattributed statements of her attorney in the motion, a declaration signed by her attorney, and findings of fact issued in other cases.[45] She did the same in her Motion for Summary Judgment, relying not on evidence adduced in the case, but again on a declaration signed by her attorney, other broad statements made by counsel in the body of the motion, and a citation to a website in a footnote.[46]

Now she's repeated these improper practices in seeking approval of her class notice plan. She provides no evidence in the form of declarations from disinterested witnesses. She, instead,

---

[44] *See*, DE 129 at p. 4.
[45] Defendant addressed these evidentiary deficiencies in its Response to the Motion for Class Certification (DE 60) and its Motion for Reconsideration of the Order granting class certification (DE 144).
[46] Defendant addressed the evidentiary shortcomings in Plaintiff's Motion for Summary Judgment in its response brief (DE 110).

relies exclusively on statements of counsel and an unauthenticated page allegedly printed from a website to support her motion.

Her counsel, for example, claims to "have consulted with Hilsoft Notifications, a business unit of Epiq Class Action & Claims Solutions, Inc. (herein "Epiq"), an experienced and reputable class action administrator to develop the best notice practicable under the circumstances."[47] There's no evidence any such consultation occurred. And even putting that issue aside, there's no evidence "Epiq" is a real entity much less that it is "an experienced and reputable class action administrator," as counsel claims. The statements are nothing more than words on a piece of paper without any legal effect in the context of federal court litigation.

To support counsel's claim regarding Epiq's purported *bona fides*, Grant alludes to a "Hilsoft Notification CV, attached as **Exhibit A**" to the Motion.[48] But Exhibit A is not a "CV." At best, it appears to be a printout from a website, another favored practice of Grant in prosecuting her case. The Court will recall that Grant chose not to conduct discovery on Voice Logic, the very entity that sent the RVMs at issue and instead, simply made a slew of factual statements and then, in a footnote, attributed those statements to a website she apparently wants the Court to not only believe belongs to Voice Logic, but to also treat as evidence in this case.[49] Now, she wants to the Court to treat a website printout as a "CV" and then, consider the "CV" as evidence in support of her pending Motion. But the Court cannot accommodate Grant's request because information on a website is "inadmissible hearsay."[50]

---

[47] *See*, DE 148 at p. 2.
[48] *Ibid.*
[49] *See,* DE 99 at p. 2, fn. 2.
[50] *See, Jackson v. Hartford Life & Acc. Ins. Co.*, 543 Fed. Appx. 977, 979 (11th Cir. 2013) (unpublished); *see also, Sun Prot. Factory, Inc. v. Tender Corp.*, 2005 WL 2484710, at *6 (M.D. Fla. Oct. 7, 2005) ("Because the websites were not properly authenticated and Knorr's statement as to the websites in Exhibit 3 is hearsay, the websites will not be considered by the Court when analyzing Defendant's Motion for Summary Judgment.")

One would expect that if "an experienced and reputable class action administrator" was "consulted" *and* agreed to undertake a class notice project, someone employed by that entity would take it upon himself or herself to provide an actual "CV" and also a signed declaration detailing the entity's experience and qualifications, as well as outlining the work that would be done to ensure the notice plan met due process requirements.[51] But that didn't happen here. Grant simply asks the Court to rely on statements of her counsel, as well as a website printout masquerading as a "CV" to sign off on her proposed class notice plan.

The notice plan offered by Grant is not a notice plan put together by Epiq—at least there's no evidence suggesting that's what occurred. It is simply her own attorney's statements outlining his proposed plan and hoping, without having heard a peep from Epiq, the Court will conclude Epiq created or "signed-off" on the plan.

Counsel claims that in the first stage of the plan:

> Epiq will validate the addresses available using the National Change of Address ("NCOA") database maintained by the United States Postal Service ("USPS"). In addition, the addresses will be certified via the Coding Accuracy Support System ("CASS") to ensure the quality of the zip code, and verified through Delivery Point Validation ("DPV") to verify the accuracy of the addresses. After this data validation is complete, each class member shall be sent the postcard notice attached as **Exhibit B**. In the event a postcard notice is returned as undeliverable, Epiq will re-mail to any new address available through USPS information—for example, to the address provided by the USPS on returned pieces for which the automatic forwarding order has expired—or to better addresses that may be found using a third-party "skip-tracing" lookup service. Finally, a Long Form Notice will be mailed via USPS first class mail to all persons who request one via the toll-free telephone number or through the website.[52]

---

[51] Epiq should have been disclosed under Rule 26; this would also have afforded Regal an opportunity to conduct discovery on the proposed administrator and the proposed mechanics of the plan.

[52] *See*, DE 148 at pp. 7-8 (emphasis in original).

None of these statements are supported by evidence almost making one wonder if Epiq even knows the honor of being proposed as the class administrator has been bestowed on it by Grant's attorneys or that Grant has also promised the Court that Epiq will create and maintain a "dedicated website."[53] At this critical point in the case, the Court *must* require more of Grant than merely referring to a website printout as a "CV" and then alluding to "consultations"  her attorneys have allegedly had with class administrators without actually submitting evidence from the administrator.

Because Grant has again failed to provide any evidence supporting her entitlement to the relief sought in a motion—this time the critical motion to approve her class notice plan—the Motion must be denied.

## IV.  Conclusion

The Old Fifth Circuit's ruling in *Nissan* compels this Court to reject Grant's class notice plan because it is both overinclusive and underinclusive. The Court certified a class composed solely of persons who received the Regal voicemail message on their cellular telephones. Yet Grant provides no means to identify those cellphone owners since the List Service data that she proposes using is undeniably inaccurate. Grant's plan will send notice to non-members, while actual members receive nothing. Her motion must be denied.

---

[53] *Ibid.*

Respectfully submitted,

/s/Charles J. McHale
Charles J. McHale, Esq.
Fla. Bar No.: 0026555
/s/ Dale T. Golden
Dale T. Golden, Esq.
Fla. Bar No.: 0094080
**GOLDEN SCAZ GAGAIN, PLLC**
201 North Armenia Avenue
Tampa, Florida 33609
dgolden@gsgfirm.com
cmchale@gsgfirm.com
*Attorneys for Defendant*